THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL COOKS, Defendant-Appellant.

First District (2nd Division)   No. 1—92—3579

Opinion filed February 28, 1995.

Michael J. Pelletier and Manuel S. Serritos, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, Elizabeth Scholz, and Michael Lechner, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

Defendant Michael Cooks, 14 years old, was charged with the murders of Rayford Taylor and Vincent Zaworski and transferred from the juvenile court, indicted, and prosecuted as an adult. Following a bench trial, defendant was found guilty of both murders and given the mandatory sentence of imprisonment for natural life. He challenges his transfer from juvenile court and the constitutionality of the mandatory life imprisonment statute. For reasons that follow, we affirm.

The juvenile transfer proceedings were held on December 27 and 31, 1990. The following evidence was adduced.

Chicago police sergeant Kwilos was assigned to investigate the shooting death of the victims on September 6, 1990. The homicides occurred at 5728 South Justine at approximately 12:30 a.m. Kwilos arrived on the scene between 12:30 and 12:45 a.m. Taylor's body was located on the landing, and Zaworski's body was located at the bottom of the staircase.

At approximately 6 a.m. Kwilos spoke with Margaret Byrd. She and the other occupants of the first-floor apartment heard gunshots. When they looked out the window, they saw two or three young men across the street. Byrd had seen them before on numerous occasions. After she heard the gunfire, Byrd saw a car backing down the street, and one of the young men was pointing a handgun at a window of an abandoned building. The young men had been "standing around" during the night of the murders, and Byrd thought they had been selling drugs.

When Byrd thought it was safe to go outside, she and Taylor went to a liquor store at 57th and Ashland. While they were at the liquor store, Zaworski, who was Byrd's boyfriend, arrived and engaged in an argument with her. The three left the liquor store, and Byrd and Zaworski continued their argument. The argument persisted on the walk back to the apartment and continued in front of the building. At that point, defendant came across the street and told them to be quiet, since if they continued arguing the police would come. Byrd then turned and walked toward the residence. As she did so, she heard gunshots. She turned around and saw Taylor on the landing and Zaworski at the bottom of the stairs. Both men had been shot.

Sadie Baker informed Kwilos that she was the owner of the building and the principal occupant of the first-floor apartment. On September 6, 1990, Byrd and Taylor had gone to the liquor store at 57th and Ashland. When Zaworski arrived at the apartment, Baker told him where they had gone. Zaworski then left to find them.

Approximately 10 to 15 minutes later, the three returned and were in front of the residence. Baker was inside the house when she heard the argument. She then looked out the window and witnessed the remainder of the argument as well as defendant crossing the street. Defendant told them to be quiet or they would attract the police. Taylor told defendant the argument was none of his business because it was a family matter. Baker then turned back toward the interior of the apartment.

After turning from the window, Baker heard two gunshots. She ran outside to the front landing, where she observed Taylor stagger-

ing up the stairs. She then saw defendant shoot Zaworski. Defendant was standing at the curb in front of the residence. Both Taylor and Zaworski had been shot in the chest. After defendant shot Zaworski, he ran across the street and into a gangway. Baker had previously seen defendant standing across the street selling drugs.

Kwilos also spoke with William Baker, Sadie Baker's 14-year-old son. Shortly after midnight on September 6, William was in the second-floor bedroom of the residence. The bedroom has a window which overlooks both the front of the residence and the sidewalk. At 12:02 a.m. William saw defendant cross the street and become involved in an argument with Taylor. William then saw defendant shoot Taylor in the chest while the two were standing at the curb. After being shot, Taylor attempted to go back inside. Defendant then shot Zaworski in the chest. Zaworski had been standing at the bottom of the steps. Defendant then ran into a gangway across the street.

Kwilos also interviewed Andrew Grant. On the night of the murders, Grant was visiting a friend who lived several houses south of the shooting scene. At that time, Grant heard a couple of gunshots and observed defendant, also known as "Pokoe," shooting Zaworski.

Grant led Kwilos to Ronnie Davis' house. Davis told Kwilos substantially the same facts: that he heard gunshots and then turned and saw a person known as "Pokoe" shooting the white man. Davis also stated that "Pokoe" was a student at Hope Grammar School and that he lived near 57th Street and Halsted.

Acting upon Davis' information, Kwilos went to Area 3, searched the nicknames file, and identified "Pokoe" as defendant. The file also indicated where he lived. Kwilos subsequently arrested defendant and brought him to Area 3.

After being given his *Miranda* rights, defendant stated that he shot both of the victims, that he was a member of the Gangster Disciples street gang, that he sold narcotics in front of 5727 South Justine, and that he was working the night shift on September 6. Defendant stated that the reason he shot the victims was because they were "older and bigger" than he was. Defendant also indicated that he would be willing to make a statement to a court reporter. The statement given to the court reporter was then introduced into evidence.

The State then introduced the autopsy reports into evidence. The reports stated that the cause of death for both victims was multiple gunshot wounds.

Probation Officer Brice testified that at the time of the hearing, defendant was 14 years old. He had five previous station adjustments and two prior referrals to juvenile court.

While in the Early Offender's Program, defendant did not attend the counseling programs to which he was referred. Defendant was also referred to a specialized school (Montefiore School). He never attended the school, however, and his grandmother did not attend the preplacement interviews at the school. At the time of the hearing, defendant had not attended school for over a year.

When Brice met with defendant on September 12, defendant told him that he had been a member of the Gangster Disciples for approximately one year. While in the gang, defendant was involved in the sale of drugs.

Brice recommended that defendant be transferred to the adult system. He based his recommendation on the seriousness of the offense, defendant's past history with the juvenile court, defendant's attitude, and his opinion that defendant should be incarcerated beyond his twenty-first birthday.

Defendant's probation officer told Brice that defendant had been cooperative up to a point. The probation officer rated defendant as satisfactory and gave his opinion that defendant was in need of counseling. A referral was made for defendant to receive counseling, but defendant did not cooperate. Defendant was also referred to the Mental Health "EKCO" program, but Brice had not spoken with the people there. Defendant did not tell Brice what role he played in the drug deals in which he participated, and Brice did not know what kind of drugs were sold.

Upon the completion of Brice's testimony, the State rested.

Gladys Cooks testified for the defense that she was defendant's grandmother. At the time of the hearing, Cooks was 54 years old and had been defendant's legal guardian since 1984 due to a conflict between his parents. Defendant had lived with Cooks since he was born, and at one point the entire family lived together. During that time, Cooks had to call the police frequently due to defendant's father's "problem," and defendant subsequently was placed in the custody of Cooks. Defendant's father is Cooks' son, and Cooks does not have a good relationship with him. In the past, Cooks had had her son arrested for abusing defendant.

Cooks described her relationship with defendant as "the best any grandmother can have with her grandson." When Cooks asked defendant to do things, he complied. Cooks had taken defendant to counseling at EKCO once a week, and it was her fault that he stopped attending the sessions.

Cooks was aware that defendant had been referred to the Montefiore School. She was told that he was referred there because he was not doing well at school. Defendant never attended Montefiore because Cooks would not let him. Her son had attended the school.

On cross-examination, Cooks testified that she was not aware that defendant had a gun at home or that defendant was a member of a street gang. Cooks was aware that he had been suspended from the John Hope School at least twice. One of the suspensions was the result of defendant and his friends breaking into the school. Cooks did not refuse to let defendant attend John Hope; defendant went there voluntarily.

On redirect examination, Cooks testified that prior to attending John Hope School, defendant did not have any problems at school. Defendant left his previous school because the curriculum went only through the fourth grade.

Patricia Berg testified that at the time of the hearing she was the executive director of the Teen Living Program, which assists "street kids" and delinquents. After establishing Berg's qualifications, the court accepted her as an expert witness in adolescent care and treatment. Berg had never previously testified in court concerning her recommendation on a transfer case.

Berg met with defendant on November 23, 1990, for approximately $2^1/2$ hours. The interview took place at the juvenile detention center, and Berg conducted it at the request of defendant's attorney. The attorney wanted a second opinion as to whether defendant had any potential for treatment and rehabilitation.

As a result of the interview, Berg reached several conclusions. First, it was her opinion that not enough attention was given to the fact that defendant was "severely abused" as a youth. Berg was of the opinion that defendant required an organic analysis. In response to whether defendant felt any remorse for his actions, Berg was of the opinion that he was unable to express emotions, so whether he felt remorse was not an appropriate question.

With regard to defendant's education, it was Berg's opinion that in order for him to be referred to Montefiore School he had to be emotionally disturbed to some extent. She was not sure to what extent he had been tested for emotional disturbance. She was also of the opinion that another problem with defendant's education was the inherent conflict between the grandmother, who would not permit him to attend the school to which he was referred, and his referral to the school. The result of this conflict would be that defendant would be "out on the streets."

Berg was not fully aware of defendant's prior experience with the court, but defendant had told her about his five previous station adjustments. She was of the opinion that there was a correlation between defendant's nonattendance at school and his delinquent activity, as evidenced by the increase in the number of station adjust-

ments. Further, the lack of a structured educational environment permitted defendant to "drift further and further into activities that are always available on the streets."

It was Berg's opinion that defendant should remain in the juvenile court system. In reaching this recommendation, Berg considered:

> "[T]here are services in almost all juvenile systems which more adequately address not only age appropriate needs, but the emotional and educational deficits that this young man has."

Her experience with the adult system suggested that it does not address those educational or emotional deficits, but rather focuses on what is considered to be age-appropriate activity. Given her experience with the court system, and as a therapist, Berg felt that the juvenile court presented the best opportunity for defendant's rehabilitation.

On cross-examination, Berg stated that there were facilities within the Juvenile Department of Corrections which met the age-appropriate needs, the psychologically appropriate needs, and the educationally appropriate needs. She was of the opinion that there are some types of therapy at the adult Department of Corrections which are not age-appropriate.

Berg did not know what specific treatments were available in the Juvenile Department of Corrections, but testified that the juvenile facility offers "a multiplicity of interventions," including educational, vocational, and emotional treatment. She stated that regardless of where he was tried, if found to have committed the murders defendant would initially be placed in the Juvenile Department of Corrections and provided with the opportunity to receive the "multiplicity of therapies." Berg considered defendant to be a danger to the community.

Dr. Nancy Feys testified that at the time of the hearing she had been chief psychologist for Cook County for almost two years. Her field of expertise is the assessment and treatment of adolescents and adults.

Feys was of the opinion that defendant should not be transferred to the adult Department of Corrections. The basis of her opinion was that defendant's emotional and educational needs were unmet during his nonattendance at school and while on probation. He should receive, she believed, long-term residential treatment in a secure environment. Additionally, he should be examined medically, psychologically, and psychiatrically to determine if there are any medical conditions that might contribute to his emotional problems. Also, he may be in need of medication. Feys was also of the opinion that before a transfer decision is reached, defendant should be examined neurologically.

If convicted, according to Feys, defendant would remain in the juvenile division of the Department of Corrections at least until he reaches the age of 17, at which time a hearing would be held in order to determine the propriety of a transfer to the adult division. Educationally, defendant would benefit from attendance at a day or residential school as well as from proper testing.

On cross-examination, Feys stated that on November 9, 1990, she interviewed defendant at the juvenile detention center. At that time, she administered several tests to defendant in addition to those already administered to him. The actual face-to-face interview lasted between 35 and 55 minutes.

Feys reviewed the results of all the tests, and defendant's scores placed him in the low/average intelligence range. In her report, Feys indicated that she did not "observe any identity of any type of learning disability" or a neurological dysfunction. Feys would not say, however, that defendant is not in need of a neurological examination, since the test results do not always coincide with the information obtained from the interview.

Feys recommended that defendant be placed in an inpatient psychiatric setting to investigate his periodic psychotic-like process and/or the possibility of organic damage to his brain. She did not, however, believe that defendant was psychotic. He did have symptoms associated with a conduct disorder.

In her report, Feys wrote that "intrinsically [defendant] is a boy who *** until the charge occurred could be described as primarily a conduct disorder, under socialized nonaggressive." In the context of assessing aggression, Feys' criterion is either aggressive or nonaggressive. She would be willing to say that a person who carries a gun is nonaggressive. She bases her determination of aggressiveness on the test results. In defining a type of behavior that Feys considers aggressive, she does not consider isolated facts, but rather looks at the facts "in the context of a lot of other things." Defendant did not exhibit behaviors that she considered to be aggressive. Her opinion was that, based upon what she knew about defendant's life, most of his behavior is nonaggressive. On the other hand, a 14- or 15-year-old who shot two people would be considered to have displayed aggressive behavior. Feys' basic analysis of defendant is that he is "primarily nonaggressive undersocialized behavior in the past with potential for becoming violent."

Feys is familiar with the juvenile court system as well as the facilities it has to offer. She also has some knowledge of the adult system. When discussing what facilities are particularly available to defendant in the Juvenile Department of Corrections to rehabilitate

him after having killed two people, Feys stated that defendant could be sent to St. Charles and then a decision would be made as to which facility would best serve his needs. She could not say for certain that the staff at St. Charles or Valley View had ever worked with a person convicted of a double homicide, but she assumed that a number of similarly situated offenders had gone there.

As for facilities in the adult system for someone convicted of a double homicide, Feys was aware that defendant could first be sent to the Juvenile Department of Corrections. While there, he would have the same psychological and psychiatric services available to him. Feys did not know whether the therapy would continue in the adult system.

Feys believed that there was a possibility that defendant could be rehabilitated before his twenty-first birthday, depending on where he was sent and how extensively he was treated. She also believed that defendant is a danger to society due to his potential to become volatile "almost without warning, poor judgment, poor reasoning, and a very abusive history." With respect to the crimes for which defendant was charged, Feys stated that when she evaluates transfer decisions, she is not supposed to dwell upon the crime, "so I take it for granted that if somebody committed a violent act that they could commit another violent act."

Upon completion of Feys' testimony, defendant rested. During argument, counsel for defendant stated:

> "To declare now at the age of 15 that he should go to an adult penal institution and tried, if convicted spend his natural life in a penitentiary, says it doesn't matter if he can be rehabilitated, it is a moot point."

After considering argument, the court transferred defendant for prosecution under the criminal laws. The court found that a grand jury would indict defendant; that the alleged offense was committed in a premeditated and aggressive manner; that defendant used a gun in the commission of the alleged offense; that defendant's age placed him within the scope of the transfer provision; that defendant had a history of criminal involvement; that there were no facilities particularly available to the juvenile court for the rehabilitation of defendant; and that the best interests of defendant and of society required that defendant remain in custody for a period of time extending beyond his minority. The court also entered a written order which reflected these findings.

Because defendant does not challenge any aspect of his trial, only minimal information about the trial is included here. The State produced the following eyewitnesses: (1) Ronnie Davis, who, although

he did not see the shootings, was familiar with defendant's voice and heard that voice at the scene of the crime at about midnight; (2) Sadie Baker, who lived at 5728 S. Justine and was inside her house at the time, heard an argument between the victims and defendant, and saw defendant shoot them both; and (3) William Baker, Sadie's 14-year-old son, who also heard the argument from inside the house and saw the shootings. According to Sadie, defendant shot Taylor when he was approximately two feet away, and defendant shot Zaworski when he was walking toward them and was about six feet away. William described Margaret Byrd as his aunt, Zaworski as his cousin, and Taylor as his "best cousin."

Police testimony was adduced concerning defendant's arrest. Chicago police officer Daniel McWeeny testified that defendant was taken into custody and made a statement to Kwilos incriminating himself. Defendant admitted shooting the two men "because the two individuals he shot were bigger than he was and that they were older than he was and that he was afraid of [them]."

The pathologist's reports on the two victims were introduced into evidence. Taylor had been shot three times, and Zaworski had been shot twice.

Assistant State's Attorney James Sanford testified as to the circumstances surrounding defendant's incriminating statement, which was admitted into evidence. Thereafter, the State rested.

Defendant called one witness, Steven (Shorty) Hudson, who was 13 years old at the time of the shootings. Hudson, defendant, and Avery Lake were talking to girls on the night in question, not selling drugs. In order to impress the girls, the young men asked Taylor, Zaworski, and Byrd, who were arguing loudly, to be quiet, but were met instead with threats that the men would "kick our asses." Taylor was drunk and Zaworski was "high or something."

Following an angry exchange between the groups, Lake handed defendant a gun, which he took with a look of surprise. Hudson later explained that defendant did not know that Lake had a gun. At that point Taylor jumped at defendant "like he was going to grab him or something." Defendant moved backwards, holding the gun away from Taylor, but cocking the gun, and "told him to get back." Taylor charged at defendant, and defendant pointed the gun at him. Zaworski, too, charged at defendant. Both Taylor and Zaworski were "larger and heftier" than defendant and his friends. After taking the weapon, defendant took no steps forward, but instead retreated.

Following the testimony of Hudson, defendant rested.

Following argument, the court found defendant guilty of both murders and continued the cause for sentencing. After a presentence

investigation report was filed, the court sentenced defendant to the mandatory term of imprisonment for natural life. This appeal followed.

# I

Defendant first asserts that his conviction must be reversed and a new transfer hearing must be ordered because in the course of the transfer hearing the juvenile court failed to consider whether or not it was in defendant's best interests or the best interests of society that defendant be imprisoned for the remainder of his life. The State responds that the circuit court is presumed to know the law and, further, that defendant's counsel put the court on notice that if defendant were transferred and convicted of double murder the mandatory sentence would be imprisonment for natural life. Defendant replies that the State has misconstrued our supreme court's holding in *People v. Clark* (1987), 119 Ill. 2d 1, 518 N.E.2d 138, which requires the court to give some consideration of how either society or a juvenile defendant would benefit from his incarceration until death before ordering his transfer.

Where a double murder has been committed by an accused, and the death penalty is not imposed, a term of imprisonment for natural life is mandatory. (730 ILCS 5/5—8—1(a)(1)(c)(ii) (West 1992).) The death penalty is not available in Illinois unless the defendant is at least 18 years of age at the time the offense is committed. (720 ILCS 5/9—1(b) (West 1992).) If the death penalty is not imposed, as it cannot be when the perpetrator is under the age of 18, the court must sentence the defendant to imprisonment for natural life. *People ex rel. Daley v. Strayhorn* (1988), 119 Ill. 2d 331, 336, 518 N.E.2d 1047, 1050.

The purpose of a juvenile transfer hearing is to determine the proper forum in which a trial of a juvenile should be conducted. (*People v. Taylor* (1979), 76 Ill. 2d 289, 302, 391 N.E.2d 366, 372.) In addition to the seven statutory factors that a juvenile court must consider (705 ILCS 405/5—4(3)(b) (West 1992)), and the requisite procedural due process considerations (*Clark*, 119 Ill. 2d at 8, 518 N.E.2d at 141-43), the supreme court found that the juvenile court must also weigh relevant nonstatutory factors, including the mandatory natural life sentence awaiting a minor upon a conviction for double murder (*Clark*, 119 Ill. 2d at 14, 518 N.E.2d at 144).

The juvenile court need not issue a formal statement of reasons or conventional findings of fact so long as the record is sufficiently explicit to allow meaningful review. (*Taylor*, 76 Ill. 2d at 300-01, 391 N.E.2d at 371.) The role of an appellate court when reviewing transfer

cases is to determine whether the juvenile court has abused its discretion. (*Taylor*, 76 Ill. 2d at 300-01, 391 N.E.2d at 371; *Clark*, 119 Ill. 2d at 14, 518 N.E.2d at 143-44; *People v. Thomas* (1981), 94 Ill. App. 3d 895, 902, 419 N.E.2d 480, 486.) No one criterion is determinative, nor must equal weight be given to every factor. *Taylor*, 76 Ill. 2d at 305, 391 N.E.2d at 373.

In *Clark*, a 14-year-old juvenile was charged, *inter alia*, with the murder of two persons. The minor was subsequently transferred to adult court where he was convicted and sentenced to imprisonment for natural life. He appealed, contending that the facts introduced at the transfer hearing were insufficient to support a transfer. The minor in *Clark* claimed that, as a matter of law, his transfer hearing was inadequate because the juvenile court failed to consider "whether or not his best interests or the best interests of society necessitated that he be imprisoned for the remainder of his life." *Clark*, 119 Ill. 2d at 7, 518 N.E.2d at 140.

The court held that it was "a critical nonstatutory element *** that the defendant allegedly murdered two people, which, upon conviction under the Criminal Code, would result in a mandatory sentence of natural life imprisonment." (*Clark*, 119 Ill. 2d at 14, 518 N.E.2d at 144-45.) The court further held that "such a harsh penalty" must be weighed by the transferring court, and that

> "where, as here, the choice is between two extremes, incarceration to age 21 under the Act or incarceration for life without possibility of parole under the Criminal Code, adequate balancing calls for consideration of which penalty would best serve both of the interests at stake." *Clark*, 119 Ill. 2d at 15, 518 N.E.2d at 144.

The court found that the record before it

> "makes it abundantly clear that the juvenile judge did not consider whether or not imprisonment of the defendant for the duration of his natural life was in his best interests or was required for the security of society." *Clark*, 119 Ill. 2d at 16, 518 N.E.2d at 144.

In *Clark*, however, the supreme court noted:

> "No one at the transfer hearing—not the assistant State's Attorney, defense counsel, or the juvenile judge—indicated any awareness that the defendant would be imprisoned for the remainder of his natural life if tried and convicted ***." (*Clark*, 119 Ill. 2d at 15, 518 N.E.2d at 144.)

The court also stated:

> "[T]here is not one scintilla of evidence in the record of the transfer proceeding that would have apprised anyone that the transfer could result in a term of natural life imprisonment. We believe, however, that no informed judgment can be made about

the disposition which will best serve the alleged juvenile offender and society where, as here, there is not the slightest consideration of how either society or the defendant would benefit by his incarceration until death." *Clark*, 119 Ill. 2d at 16, 518 N.E.2d at 144-45.

This issue comes down to whether defense counsel's statement in closing argument at the transfer hearing that defendant would "if convicted spend his natural life in a penitentiary" meets the requirement established in *Clark* that the juvenile court must consider whether imprisonment of a juvenile defendant in a double murder case "for the duration of his natural life was in his best interests or was required for the security of society." (*Clark*, 119 Ill. 2d at 16, 518 N.E.2d at 144.) Is this the "scintilla of evidence" or the "slightest consideration" that was missing in *Clark*?

This case may be distinguished from *Clark* in that defense counsel put the mandatory natural life sentencing issue squarely before the court. It cannot be said here, as our supreme court said in *Clark*, that no one indicated any awareness of the sentence awaiting defendant if he were to be transferred and found guilty. On the contrary, in this case *everyone*, most particularly including the juvenile judge, must be deemed to have been aware of the sentence awaiting defendant.

In its recital of its findings in ordering the transfer of the juvenile, the juvenile court carefully covered all seven statutory factors, but there is no statement on the record of any consideration of the *Clark* factor. Such a statement need not be explicitly on the record, however; it must merely be discernible from the record. (*Taylor*, 76 Ill. 2d at 301, 391 N.E.2d at 371; *People v. D.B.* (1990), 202 Ill. App. 3d 194, 205, 559 N.E.2d 873, 880.) A judge is presumed to know sentencing alternatives (*People v. Buchanan* (1991), 211 Ill. App. 3d 305, 570 N.E.2d 344, *appeal denied* (1991), 141 Ill. 2d 547, 580 N.E.2d 121), and in this case the sentence awaiting defendant was explicitly brought to the court's attention.

The State, however, misconstrues *People v. Ollins* (1992), 231 Ill. App. 3d 243, 606 N.E.2d 192, when it argues that because the judge is presumed to know the law there is no requirement that a juvenile court make an adequate record that it considered that a mandatory natural life sentence could result from its transfer decision. The defendant in *Ollins* was not facing such a mandatory sentence because he was charged with only one murder; he was given a discretionary sentence of natural life because the court found that the crime was committed in a brutal and heinous fashion. (*Ollins*, 231 Ill. App. 3d at 250, 606 N.E.2d at 198.) Additionally, the defendant's challenge in *Ollins* was primarily to the juvenile court's weighing of the statutory

factors rather than to the nonstatutory *Clark* factor. (*Ollins*, 231 Ill. App. 3d at 247-49, 606 N.E.2d at 196.) *Ollins* is not on point in this case.

Our courts have held repeatedly that the record must be sufficiently explicit to allow meaningful review of the court's treatment of the seven statutory factors. (See, *e.g., Taylor*, 76 Ill. 2d at 300-01, 391 N.E.2d at 371; *D.B.*, 202 Ill. App. 3d at 205, 559 N.E.2d at 880.) *Clark* implies that the same standard should apply to the nonstatutory factor at issue here. The question for this court is whether the single mention of the sentence awaiting defendant in defense counsel's final argument without any other indication of consideration in the record makes the record sufficiently explicit for meaningful review. We hold that it does.

■ It is undisputed that the juvenile court was aware of the natural life sentence awaiting defendant, and this case is therefore distinguishable from *Clark*. A court is presumed to know the law (*People v. Gilbert* (1977), 68 Ill. 2d 252, 369 N.E.2d 849; *People v. Buchanan* (1991), 211 Ill. App. 3d 305, 322, 570 N.E.2d 344), and this presumption is rebutted only when the record affirmatively shows the contrary (*People v. Wallenberg* (1962), 24 Ill. 2d 350, 181 N.E.2d 143; *Buchanan*, 211 Ill. App. 3d at 322, 570 N.E.2d at 356). There is no affirmative showing to the contrary here, as there was in *Clark*, and we therefore decline to reverse defendant's convictions and order a new transfer hearing.

II

Defendant's second assertion is that the juvenile court abused its discretion in its consideration of five of the seven criteria for transfer specified in section 5—4(3)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/5—4(3)(b) (West 1992)). The State responds that the record establishes that the juvenile court properly considered each factor, that there was no abuse of discretion, and that defendant's transfer for prosecution under the criminal laws was proper.

The judicial discretion involved in deciding whether to transfer a juvenile to the criminal division for trial is not limitless. This discretion is controlled by the Juvenile Court Act, which states:

"In making its determination on a motion to permit prosecution under the criminal laws, the court shall consider among other matters: (i) whether there is sufficient evidence upon which a grand jury may be expected to return an indictment; (ii) whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner; (iii) the age of the minor; (iv) the previous history of the minor; (v) whether there are facilities

particularly available to the Juvenile Court for the treatment and rehabilitation of the minor; (vi) whether the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his majority; and (vii) whether the minor possessed a deadly weapon when committing the alleged offense." 705 ILCS 405/5—4(3)(b) (West 1992).

As stated above, the purpose of a transfer hearing is to determine the proper forum in which the trial should be conducted, not to determine guilt or innocence. (*People v. Taylor* (1979), 76 Ill. 2d 289, 302, 391 N.E.2d 366, 372.) The factors to be considered require only a probable cause standard of proof, and the same rules of evidence used in dispositional hearings are applicable to transfer hearings. (*Taylor*, 76 Ill. 2d at 301-04, 391 N.E.2d at 371-72; 705 ILCS 405/5—4(3)(b) (West 1992).) Accordingly, evidence which is not competent for an adjudicatory hearing, including hearsay evidence, is properly considered at a transfer hearing. 705 ILCS 405/5—22(1) (West 1992); *Taylor*, 76 Ill. 2d at 305, 391 N.E.2d at 373.

It is not necessary that all factors be resolved against the juvenile in order to allow transfer. (*People v. Kraman* (1981), 96 Ill. App. 3d 390, 402, 421 N.E.2d 346, 357.) The State need present only evidence sufficient to persuade the juvenile court, in its discretion, that transfer is justified in light of the statute. (*People v. Newell* (1985), 135 Ill. App. 3d 417, 421, 481 N.E.2d 1238, 1242.) Equal weight need not be given all factors, and no single factor is solely dispositive. (*Newell*, 135 Ill. App. 3d at 421, 481 N.E.2d at 1242.) On appeal, a court of review must determine whether the juvenile court abused its discretion in granting the motion. *People v. M.D.* (1984), 101 Ill. 2d 73, 83, 461 N.E.2d 367, 372; *People v. Bridges* (1989), 188 Ill. App. 3d 961, 965, 545 N.E.2d 367, 370, *appeal denied* (1990), 129 Ill. 2d 566, 550 N.E.2d 559.

■ As indicated above, the record establishes that the juvenile court considered evidence on each of the statutory factors in reaching its decision to transfer defendant to the criminal division for trial. Since the juvenile court considered evidence on each factor, and the record contains its statement regarding each factor, it cannot be said that the juvenile court abused its discretion. (*People v. D.B.* (1990), 202 Ill. App. 3d 194, 200, 559 N.E.2d 873, 880.) Consequently, we will not disturb the juvenile court's transfer decision based upon the court's assessment of the statutory factors.

Contrary to defendant's claims, Officer Kwilos' testimony at the hearing was not "patently inadequate." Kwilos provided comprehensive testimony which was sufficient to satisfy the probable cause

standard of proof which exists for the statutory factors. (*Taylor*, 76 Ill. 2d at 301-04, 391 N.E.2d at 371-72; 705 ILCS 405/5—4(3)(b) (West 1992).) Kwilos' testimony contained hearsay evidence, to be sure, but hearsay is fully admissible in such a hearing. (*Taylor*, 76 Ill. 2d at 305, 391 N.E.2d at 373.) There is no reason to modify the standard of review, as defendant suggests.

## III

Defendant finally asserts that the mandatory natural life provision of the Unified Code of Corrections (730 ILCS 5/5—8—1(a)(1)(c)(ii) (West 1992)) is unconstitutional on its face and as applied to him. He argues that prior determinations of the statute's constitutionality did not properly consider the due process clause of the fourteenth amendment or the eighth amendment. He further argues that the legislature expressed a preference for retaining jurisdiction in the juvenile court in the cases of defendants 14 years old and under and that this preference must be considered in this case. The State responds that defendant's argument has been rejected on numerous occasions and must be rejected again.

■ Defendant contends that imposing a life sentence without considering facts and circumstances relevant to an individual defendant, as happens with a mandatory life imprisonment statute, violates due process and the eighth amendment. Our supreme court, however, in *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059, stated:

"There is a presumption of the validity of legislative classifications. [Citations.] We conclude that the legislature considered the possible rehabilitation of an offender, as well as the seriousness of the offense of multiple murders, in determining that in the public interest there must be a mandatory minimum sentence of natural life imprisonment. The rehabilitative objective of article I, section 11, should not and does not prevent the legislature from fixing mandatory minimum penalties where it has been determined that no set of mitigating circumstances could allow a proper penalty of less than natural life for the crimes of two or more murders. It is within the legislative province to define offenses and determine the penalties required to protect the interest of our society." (*Taylor*, 102 Ill. 2d at 206, 464 N.E.2d at 1062.)

Defendant's argument that it is unconstitutional to impose a life sentence without considering facts and circumstances relevant to a particular defendant has already been decided against him.

Additionally, our supreme court in *Taylor* and in *People ex rel. Daley v. Strayhorn* (1988), 119 Ill. 2d 331, 518 N.E.2d 1047, implicitly rejected the contention that section 5—8—1(a)(1)(c) violates the

eighth amendment. The appellate court on many occasions has similarly rejected the claim that the statute violates the eighth amendment. (See, *e.g.*, *People v. Glenn* (1992), 233 Ill. App. 3d 666, 599 N.E.2d 1220, *appeal denied* (1992), 147 Ill. 2d 631, 606 N.E.2d 1230; *People v. Gant* (1990), 202 Ill. App. 3d 218, 559 N.E.2d 923, *appeal denied* (1990), 135 Ill. 2d 561, 564 N.E.2d 842.) We therefore decline to reverse defendant's convictions on these grounds.

Defendant also argues that the mandatory natural life sentencing provision is unconstitutional as applied to him because there is a legislative and judicial preference for the juvenile court retaining jurisdiction over defendants 14 years of age or less. Our supreme court in *Clark*, however, stated:

"[T]he legislature struck the balance in favor of societal security by vesting exclusive jurisdiction over these alleged juvenile offenders within the criminal court. In choosing to continue the jurisdiction of the juvenile court over 13- and 14-year-old juveniles suspected of murder *** while providing for waiver of jurisdiction and transfer for trial under the Criminal Code, the legislature was reaffirming its preference that the juvenile judge strike the necessary balance as required by section 2—7(3) and the facts of each case." (*Clark*, 119 Ill. 2d at 13, 518 N.E.2d at 143.)

How defendant translates this into a conclusion that there is a preference for the juvenile court to retain jurisdiction over 14-year-olds charged with murder is unclear. In this portion of the opinion, the court simply affirmed its earlier statement that

"the purpose of any transfer proceeding is to balance the best interests of the alleged juvenile offender *** against society's legitimate interest in being protected from criminal victimization perpetrated by minors." (*Clark*, 119 Ill. 2d at 12, 518 N.E.2d at 143.)

There is no legislative preference for the juvenile court to retain jurisdiction over 14-year-olds charged with murder, and *Clark* did not imply that there was. Instead, the court simply reaffirmed its mandate that in transfer cases the juvenile court should follow the statute, which requires a balancing of interests.

Defendant's argument that his conduct "pales in comparison" to that of two other defendants under the age of 15 who received natural life sentences (see *Clark*, 119 Ill. 2d 1, 518 N.E.2d 138, and *People v. Ollins* (1992), 231 Ill. App. 3d 243, 606 N.E.2d 192) is unpersuasive. Defendant murdered two unarmed persons in cold blood. He actually had to walk back across the street to retrieve the gun with which he shot them repeatedly. His conduct might have been worthy of a discretionary sentence of natural life imprisonment because of its

42

brutal and heinous nature if it had not been subject to a mandatory sentence of natural life.

■ Defendant has failed to demonstrate that the mandatory life imprisonment statute is unconstitutional on its face or as applied to him. We therefore decline to reverse his convictions on constitutional grounds.

For all of these reasons, the judgment of the circuit court is affirmed.

Affirmed.

SCARIANO, P.J., and HARTMAN, J., concur.