THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SHAWN FULLER, Defendant-Appellant.

First District (4th Division)    No. 1—95—2112

Opinion filed September 18, 1997.

652

Rita A. Fry, Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Celeste Stewart Stack, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:
Defendant, Shawn Fuller, 14 years old, was transferred from ju-

venile court to the criminal court to be prosecuted for first-degree murder. 720 ILCS 5/9—1 (West 1992). After a jury trial, he was found guilty and was sentenced to 35 years' imprisonment. On appeal, defendant asserts that (1) his transfer from juvenile court to the criminal court was an abuse of discretion; (2) the trial court erred in failing to quash the arrest and suppress the evidence; (3) his confession was involuntary; (4) the trial court erred in failing to excuse two prospective jurors for cause; (5) the jury should have been instructed on the lesser offense of involuntary manslaughter; (6) the State's closing argument remarks were prejudicial; (7) the trial court abused its discretion in failing to honor the jury's request for a transcript; (8) an allegation of juror coercion entitles him to an evidentiary hearing; and (9) his sentence was excessive.

At the juvenile court hearing to determine whether defendant would be transferred to the criminal court, Chicago police officer Gary Horacek testified that he responded to a call of a man shot at 12:25 a.m. on November 8, 1992. When he arrived at 50th and Campbell Streets, Chicago, he saw the victim, George Bonk, who had died of multiple gunshot wounds. Officer Horacek interviewed several neighbors, who stated that they heard three gunshots but did not see the shooting.

Chicago police detective Nicholas Crescenzo testified that he spoke to Theresa Zielinski at 2 a.m. on December 11, 1992. Zielinski told him that she was at defendant's house on the night of the shooting. Shortly after midnight, defendant returned home in a black car driven by someone named Johnny. Defendant, who was nervous and panicky, told Zielinski that he had been shooting at rival gang members when he shot a bystander by accident. Defendant told Zielinski to spread the word around the neighborhood that someone else was the shooter.

Crescenzo further testified that, after interviewing Zielinski, Crescenzo and his partner arrested defendant, advised him of his *Miranda* rights, and told him that he could have his parents present. Defendant told Crescenzo that, on the night of Bonk's murder, he left a gang meeting in a black Buick with a fellow gang member named Johnny. After getting a gun and ammunition, Johnny put the gun under the car's front seat so that he could pull it out quickly if they saw rival gang members. As they were driving west on 50th Street towards Campbell, they saw rival gang members, who yelled insults. Johnny pulled out the gun, put in the clip, and handed it to defendant, saying, "[C]lap 'em, cap 'em!" Defendant took the gun, leaned out the car window, and fired at the rival gang members. The next day, he learned that someone had been killed.

Jean Marie Zupan, defendant's probation officer, described defendant as having an above-average intelligence and no educational problems, and being academically capable and talented. However, he was a severely emotionally disturbed and violent person who came from a violent, severely unstable, dysfunctional family. Although Zupan thought defendant was a danger to himself and to others, she also stated that he was eager to get attention and praise from adults and did well in one-on-one therapy.

It was Zupan's opinion that defendant's problems resulted from his upbringing and family situation. Because his home was not an appropriate place for defendant, Zupan recommended that he stay in the juvenile system, where he could get mental health residential services. She thought that he should be placed out of state to avoid contact with his family.

Zupan explained that defendant had previously attended behavior disorder programs at five schools. For nine months in 1991, he attended a residential program at the Mill School in Rockford. Initially, he was very disruptive and had to be restrained several times, but eventually he made progress. Unfortunately, his father refused further residential treatment and defendant went home. Defendant then attended Oak Therapeutic Day School for eight weeks. A social worker there told Zupan that defendant had learned how to manipulate therapy to give the impression of compliance without any real progress.

In 1992, defendant was admitted to Children's Psychiatric University Hospital after he threatened to kill himself and his father. The hospital social worker told Zupan that defendant was initially noncompliant, but then progressed and responded well to the structured environment. At the time of his arrest, defendant was attending Hillside Day Academy.

Defendant told Zupan that he joined the Campbell Kings street gang when he moved into his neighborhood in April 1992. Prior to his arrest, defendant stayed in the house most of the time because he was afraid to go outside. Previously, in 1989, he had been in the Disciples street gang for five months, but he quit after being shot with a BB gun and harassed by other kids.

Defendant had six station adjustments: disorderly conduct in December 1987; criminal trespass to property in April 1989; assault in May 1989; criminal trespass to property in July 1992; a racial incident and mob action in August 1992; and a gang adjustment in September 1992.

Responding to the court's questions about the availability of long-term residential programs for juveniles, Zupan stated that there was

a possibility that defendant would go home if none were available. Zupan did not know what residential programs were available for defendant as an adult or whether defendant's father could be precluded from regaining custody of defendant. Zupan explained, however, that defendant could be declared a ward of the court, which could monitor his treatment and place him wherever it saw fit, thus preventing him from returning home.

Douglas Cater, a social worker at the McKinley Intervention Services, testified that he had been counseling defendant's family for a year prior to Bonk's murder. Cater described defendant's family life as chaotic with little nurturing and much bickering and fighting. Cater had not seen much improvement while he was working with the family.

According to Cater, the principals at defendant's schools liked defendant and wanted him back. Cater thought it was in defendant's best interest to be in a residential treatment institution where he could get regular intensive psychological counseling. Defendant had told Cater he was recruited into a gang in May 1992 by someone who was nice to him. Cater felt that defendant was vulnerable to that type of influence due to his family situation. After defendant was badly beaten by rival gang members in August 1992, he was afraid to go outside. As a result, he stayed home most of the time and developed a vocal tick. Although defendant had soured on the gang life, he remained a gang member to receive protection and because he was afraid that his own gang would hurt him if he tried to get out. It was Cater's opinion that defendant is very intelligent, has much potential, and should stay in the juvenile system since he is very cooperative when he is nurtured.

After arguments, the juvenile court granted the State's motion to transfer defendant to the criminal court. In its findings, the court found that there was sufficient evidence upon which a grand jury would be expected to return an indictment, there was evidence that the offense was committed in an aggressive and premeditated manner, defendant was 14 years, 8 months old at the time of Bonk's murder, and defendant possessed a deadly weapon when he committed the offense. In reviewing defendant's prior history, the court concluded that it was sufficient to warrant a transfer. Finally, the court considered whether there were facilities available for defendant's treatment and rehabilitation and whether the best interests of the minor and the security of the public would require that defendant continue in custody after his twenty-first birthday.

Defendant asserts that his transfer to the criminal court was an abuse of discretion, which defied the recommendation of every wit-

ness. Defendant maintains that the trial court erroneously believed that his father would invariably retain legal custody, thus enabling his father to sabotage his progress, unless he was prosecuted under the criminal laws.

■ Section 5—4(3)(a) of the Juvenile Court Act of 1987 (705 ILCS 405/1—1 et seq. (West 1994)) permits criminal prosecution of a minor at least 13 years of age for any offense if, upon the motion of the State's Attorney, a juvenile court judge finds that it is not in the best interests of the minor or of the public to proceed under the Juvenile Court Act. *People v. Beck*, 190 Ill. App. 3d 748, 753, 546 N.E.2d 1127 (1989); 705 ILCS 405/5—4(3)(a) (West 1992). The purpose of any transfer proceeding is to balance the best interests of the alleged juvenile offender, particularly as those interests relate to his potential for rehabilitation, against society's legitimate interest in being protected from criminal victimization by minors. *People v. Clark*, 119 Ill. 2d 1, 12, 518 N.E.2d 138 (1987).

Section 5—4(3)(b) of the Juvenile Court Act of 1987 lists several factors that a juvenile court judge must consider in deciding whether a minor should be prosecuted as an adult. *In re R.T.*, 271 Ill. App. 3d 673, 677, 648 N.E.2d 1043 (1995); 705 ILCS 405/5—4(3)(b) (West 1992). Although the juvenile court's inquiry is not limited to the statutory factors, the court must at a minimum consider: (1) whether there is sufficient evidence upon which a grand jury may be expected to return an indictment; (2) whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner; (3) the age of the minor; (4) the previous history of the minor; (5) whether there are facilities available to the juvenile court for the minor's treatment and rehabilitation; (6) whether the best interests of the minor and the security of the public require that the minor continue in custody or under supervision for a period extending beyond his minority; and (7) whether the minor possessed a deadly weapon when committing the alleged offense. 705 ILCS 405/5—4(3)(b) (West 1992). Finally, the judge weighing these relevant factors must determine whether to strike the balance for society by transferring the alleged juvenile offender or to strike the balance for the juvenile by retaining jurisdiction. *Beck*, 190 Ill. App. 3d at 755, citing *Clark*, 119 Ill. 2d at 14.

In a transfer hearing, the State has the burden of presenting sufficient evidence to persuade the juvenile court to grant a motion to transfer. *People v. Taylor*, 76 Ill. 2d 289, 304, 391 N.E.2d 366 (1979); *In re L.J.*, 274 Ill. App. 3d 977, 979, 654 N.E.2d 671 (1995). Although no single factor is dispositive, equal weight need not be given to all the factors. *Taylor*, 76 Ill. 2d at 305; *People v. Cooks*, 271 Ill. App. 3d

25, 39, 648 N.E.2d 190 (1995). The State must only present evidence sufficient to persuade the juvenile court, in its discretion, that transfer is justified in light of the statute. *Cooks*, 271 Ill. App. 3d at 39. It is not necessary that all factors be resolved against the juvenile. *Cooks*, 271 Ill. App. 3d at 39.

The role of the appellate court when reviewing transfer cases is to determine whether, in evaluating the evidence in light of the statutory criteria, the juvenile court has abused its discretion. *Taylor*, 76 Ill. 2d at 300-01; *In re R.T.*, 271 Ill. App. 3d at 677. We find that the juvenile court did not abuse its discretion when it transferred defendant to the criminal court.

■ The first factor to consider is whether there was sufficient evidence introduced at the transfer hearing upon which a grand jury could be expected to return an indictment. The factors to be considered require only a probable cause standard of proof. *Taylor*, 76 Ill. 2d at 303; *In re R.T.*, 271 Ill. App. 3d at 679; *Cooks*, 271 Ill. App. 3d at 39. Given the facts of this case, there was sufficient evidence introduced at the transfer hearing.

The second factor is whether the evidence shows that the alleged offense was committed in an aggressive and premeditated manner. The record contains evidence that this murder was committed in an aggressive and premeditated manner.

The third factor is defendant's age, which was 14 years 8 months at the time of Bonk's murder. Since 15-year-old minors are automatically tried as adults for first-degree murder, defendant would have automatically been tried as an adult if the murder had occurred four months later. 705 ILCS 405/5—4(6)(a) (West 1992).

The fourth statutory factor that the court must consider is the previous history of the minor. In this case, defendant had a very troubled home life, wanted approval from adults, and was looking for security. He had attended five behavior disorder programs since he was in elementary school, but his father refused to place him in any more residential treatment programs, which had helped him in the past. Defendant joined a gang for five months when he was 11 years old, but left. Again, when he was 14 years old, he joined a different gang but became afraid after being beaten up by rival gang members.

In addition, defendant had six station adjustments, or verbal warnings from the police, which are relevant considerations at a transfer hearing. *Beck*, 190 Ill. App. 3d at 758-59. A station adjustment occurs when the police take a minor to the police station but release him after deciding not to prosecute. *People v. D.B.*, 202 Ill. App. 3d 194, 203, 559 N.E.2d 873 (1990).

The fifth factor is whether there are facilities particularly avail-

able to the juvenile court for defendant's treatment and rehabilitation. The statute requires that the juvenile court receive and evaluate information about the facilities available for the minor's treatment or rehabilitation. *Clark*, 119 Ill. 2d at 17. Although the testimony regarding available treatment facilities was confusing, the judge examined the possibilities for defendant's treatment as a juvenile and as an adult.

The sixth factor is whether the best interests of the minor and the security of the public require that the minor continue in custody or under supervision for a period extending beyond his minority. This factor is actually a balancing of the other factors.

The final factor at the time of defendant's transfer hearing was whether the offense was carried out with a deadly weapon. Since the victim was shot with a gun, that factor supports defendant's transfer to the criminal court.

After considering the statutory factors for transfer, we find that there was no abuse of discretion. The judge considered all the relevant factors and was particularly aware of defendant's emotional problems and past treatment. This court cannot reweigh all the factors but must decide whether there was an abuse of discretion. *Taylor*, 76 Ill. 2d at 300-01; *In re R.T.*, 271 Ill. App. 3d at 677; *Cooks*, 271 Ill. App. 3d at 39. We find no abuse of discretion.

Next, we consider whether the trial court erred when it denied defendant's motion to quash arrest and suppress evidence. Defendant argues that the police lacked probable cause to arrest him because the arrest was based solely on unreliable information obtained by police coercion and overt threats against Theresa Zielinski during their overnight interrogation of her. Furthermore, defendant argues, her statement was uncorroborated.

The State argues that the trial court's denial of the motion to quash arrest was not manifestly erroneous because Zielinski's information was trustworthy and reliable even though she testified at trial that she did not want to speak to the police.

■ Whether or not probable cause for an arrest exists depends on the totality of the facts and circumstances known to the officers when the arrest was made. *People v. James*, 118 Ill. 2d 214, 223, 514 N.E.2d 998 (1987). If an informant is the source of the information, as in this case, an independent showing of reliability is required because of the obvious risk of misrepresentation or outright fabrication. *James*, 118 Ill. 2d at 223. However, the court looks to the informant's reliability as only one of the factors to be considered in the totality of the circumstances approach. *People v. Adams*, 131 Ill. 2d 387, 546 N.E.2d 561 (1989).

While the basis of the informant's knowledge is relevant, the central issue is not whether the informant is an ordinary citizen or a paid informant but, rather, whether the information, taken in its totality, and interpreted not by technical legal rules but by factual and practical commonsense considerations, would lead a reasonable and prudent person to believe that the person arrested had committed an offense. *Adams*, 131 Ill. 2d at 396-97. The question we must resolve is whether Zielinski's statements, considered in light of the totality of the circumstances, were sufficient to establish probable cause to arrest defendant. *People v. Shelby*, 221 Ill. App. 3d 1028, 1038, 582 N.E.2d 1281 (1991).

During the hearing on defendant's motion to quash arrest and suppress evidence, Chicago police detective Craig Cegielski testified that he and his partner interviewed Zielinski at 2 a.m. on December 11, 1992, in the police station. Zielinski told them that she spoke with defendant at his home on November 8, 1992, shortly after Bonk's murder. Defendant told her that he had just shot someone at 50th and Campbell Streets. Cegielski denied threatening Zielinski in any way. Based on Zielinski's information, Cegielski and Detective Crescenzo arrested defendant. Zielinski did not testify at the motion hearing.

The trial court denied defendant's motion to quash arrest and suppress evidence. At trial, Zielinski testified that the police picked her up in front of her house at 3 p.m. on December 10, 1992. They took her to the police station and put her in a small room where five officers questioned her about the Bonk murder. She slept in a chair in the police station during the night. Initially, she told the police that she did not know anything about the murder. However, after they yelled at her, threatened to arrest her for the shooting, and threatened physical violence, she was scared. As a result, she gave her statement, which she testified was truthful. She was released around 3 p.m. the next afternoon after she testified in front of the grand jury.

Zielinski admitted that she told an investigator for the defense attorney that she did not remember what defendant said to her on the night of the murder because she had been drinking that night. She further told the investigator that she lied to the police because they were harassing her and that defendant never told her that he shot anyone. Zielinski stated on redirect examination that she was afraid of defendant's investigator because she feared the Latin Kings gang.

The defense counsel questioned Zielinski about her arrest for failure to appear in court pursuant to a subpoena in this case. As a

result of the arrest, she spent over a month in jail, during which time she gave birth. At the time of the trial, there was a pending contempt of court charge against her and she was on electronic home monitoring. She admitted that she was a reluctant witness.

■ We affirm the trial court's decision that probable cause was established since it was not manifestly erroneous. *People v. Jones*, 156 Ill. 2d 225, 237, 620 N.E.2d 325 (1993). Even assuming that Zielinski's statement was given after questionable conduct by the police, she testified at trial that the information she gave was truthful. Defendant did not assert that the information was the fruit of an illegal arrest, for which he had no standing, but that the police tactics made the statement unreliable. The record gives no indication that the statement was unreliable, especially since Zielinski stated at trial that it was truthful.

Next, defendant asserts that his custodial statement was involuntary because he was interrogated by the police without a parent or youth officer being present and did not understand the criminal legal system or the seriousness of the crime.

During the hearing on his motion to suppress statements, defendant testified that on December 11, 1992, he was on a school bus when police officers stopped the bus and told him he was wanted for questioning regarding a murder in the neighborhood. At the police station, defendant was handcuffed to a chair and no youth officer was present. He admitted that he told the detectives to call his mother instead of his father, but he maintained that he never told the police that he did not want either of his parents present during his questioning. Further, defendant stated that he asked to speak to his ex-landlord, who was an attorney, but the police refused. In addition, defendant testified that both detectives hit him in the head once and that Crescenzo threatened him with a chair if he did not talk. Defendant stated that he was scared and nervous.

Defendant further testified that Assistant State's Attorney Andrew LeFevour told him he would get one year of probation and could leave the station if he signed the statement. Defendant claimed that he read only the bottom part of the first page and a small amount of the second page. He initialed corrections in his statement, but he did not read them even though the police told him to read the statement and sign it. However, defendant did tell the police to include in his statement that he wanted to get out of the gang and remove his gang tattoos. After the statement was written and signed, a youth officer entered the room and asked defendant if he had signed the statement. After the statement was signed, he spoke with his parents.

Flora Wilson, a Chicago police youth officer, testified that she received a call from Detective Crescenzo around 9 a.m. on December 11, 1992, regarding defendant. At that time, she introduced herself to defendant, then returned to her office to wait for the assistant State's Attorney to arrive. She was not present when Detectives Crescenzo and Cegielski questioned defendant and did not speak with defendant herself.

At 10:30 a.m., Wilson went to the small conference room where defendant was seated. After the assistant State's Attorney gave defendant his *Miranda* rights, defendant stated that he understood his rights and did not appear to have any difficulty with them. Defendant then gave an oral statement concerning the murder. After the statement was put into writing, Wilson, defendant, Detective Crescenzo, and LeFevour signed it. Wilson was present with defendant in a photograph taken after the statement was completed. The back of the photograph indicated that it was taken at 11:40 a.m.

Defendant's mother, Cheri Vandermyde, testified that Detective Crescenzo called her office around 10 or 10:15 a.m. on December 11, 1992. He told her that her son was in custody for murder and had asked for her. Because Vandermyde did not have transportation, Crescenzo sent someone to get her. She arrived at the police station at approximately 10:30 a.m. and was seated in an office. Because the office door was open, she could see the door of the room where defendant was being questioned. Vandermyde was told that she could see her son after the assistant State's Attorney was finished interviewing him, not that she could go into the room and speak with her son during the statement. She denied saying she was glad her son was cooperating.

Andrew LeFevour, who was an assistant State's Attorney on December 11, 1992, testified that he arrived at the police station around 10:30 a.m. After speaking with the detectives and interviewing Zielinski, he spoke to defendant. With a youth officer present, LeFevour explained who he was, then gave defendant his *Miranda* and juvenile rights, which are that he might be tried as an adult and that he had the right to have his parents present for the interview. After defendant was told that his parents had been contacted, he said that he did not want his parents present because he would feel uncomfortable.

Defendant gave LeFevour an oral statement, which he agreed to have memorialized in writing. While LeFevour was writing out defendant's statement, a youth officer was present. At one point, LeFevour left the room to photocopy additional statement forms. He was told that defendant's mother had arrived, so he introduced

himself to her. LeFevour testified that he told Vandermyde that he had spoken to defendant, who was in the process of giving a written statement about the murder. Although he told her that she could see her son at any time, she stated that she did not want to go in until after he finished his statement. She also said that she was glad defendant was cooperating.

After his conversation with Vandermyde, LeFevour returned to defendant. LeFevour told defendant that his mother was in the station and asked if he wanted to see her. Defendant responded that he did not want to see his mother until he finished the statement.

Defendant did not complain to LeFevour that he had been mistreated or that any promises or threats were made. LeFevour denied that he told defendant that three witnesses had signed statements against him or that he would get probation. LeFevour described defendant as seeming very familiar with his *Miranda* rights, being very articulate and relaxed, and being very willing to speak with LeFevour.

When the statement was completed, LeFevour had defendant read part of the statement aloud, told defendant he could make any corrections he wanted, and had defendant sign each page of the statement. After the statement was completed, LeFevour took a photograph of defendant. As LeFevour was leaving, defendant's mother came into the room, followed shortly thereafter by defendant's father.

Detective Craig Cegielski testified that he took defendant off a school bus on December 11, 1992, but did not handcuff him. As he and his partner were taking defendant back to his house to notify his father, defendant asked them not to notify his father because he was afraid he would get kicked out of the house. Instead, he wanted his mother to be notified at her job.

Shortly after Cegielski and Crescenzo arrived at the police station, they contacted the youth officer. Between 10:30 and 11 a.m., Vandermyde was brought to the station and put in an office 30 to 40 feet from the room where defendant was being interrogated. As Cegielski was seating Vandermyde, LeFevour came out of the room where he was interviewing defendant. Cegielski introduced LeFevour to Vandermyde, who said that she would wait to see defendant until after the statement was finished as long as he was cooperating.

According to Cegielski, defendant never asked to speak to an attorney or to his mother, and the police never denied his parents access to defendant. Further, Cegielski denied hitting defendant, telling defendant that he would be convicted because there were three witnesses against him, or telling him that he would receive probation and could go home after signing the confession.

Detective Nick Crescenzo testified that defendant insisted that they contact his mother and not his father. Between 8:30 and 9 a.m., Crescenzo and Cegielski questioned defendant for one-half hour. At that time, defendant made a confession. At about 9 a.m., the detective contacted a youth officer. At that time, the youth officer, Flora Wilson, spoke to defendant, who was not handcuffed. No one spoke to defendant between 9 and 10:30 a.m., when the assistant State's Attorney arrived. After speaking to a witness and reviewing reports, LeFevour gave defendant his *Miranda* rights. Defendant then gave an oral statement followed by a written statement. Wilson, LeFevour, and Crescenzo were present during the statement, which was written between 11 and 12 noon. Defendant made corrections and additions and read part of the statement aloud.

Crescenzo further stated that defendant was never told that there were three witnesses against him, that he could go home if he signed the statement, or that he would receive probation. According to Crescenzo, defendant never asked to speak with his parents or to an attorney. In fact, defendant emphatically did not want his parents present during the interrogation.

Defendant's mother was brought to the police station between 10:30 and 11 a.m. and Crescenzo saw her in an office at 11:30 a.m. while defendant's statement was being prepared. Crescenzo told Vandermyde about the murder and that her son was cooperating. She said that she was happy he was cooperating and would wait to see him when the statement was finished. Crescenzo denied telling her that she had to wait until the statement was finished.

The trial court concluded that the statements were voluntary and denied the motion to suppress statements.

■ The receiving of an incriminating statement by a juvenile in the absence of counsel is a sensitive concern requiring great care to assure that the juvenile's confession was neither coerced, suggested, nor the product of fright or despair. *People v. Prude*, 66 Ill. 2d 470, 476, 363 N.E.2d 371 (1977). To be admissible at trial, a confession must be free, voluntary, and not obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. *Malloy v. Hogan*, 378 U.S. 1, 12 L. Ed. 2d 653, 84 S. Ct. 1489 (1964); *People v. Thomas*, 137 Ill. 2d 500, 516, 561 N.E.2d 57 (1990). The test for the voluntariness of a confession is whether, under the totality of the circumstances, the statement was made freely, without compulsion or inducement, with consideration given to the characteristics of the accused and the details of the interrogation. *Jones*, 156 Ill. 2d at 242; *Thomas*, 137 Ill. 2d at 516.

Under the Juvenile Court Act (705 ILCS 405/5—6 (West 1992)), a

law enforcement officer who takes a minor into custody shall immediately make a reasonable attempt to notify the parent and shall without unnecessary delay take the minor to the nearest juvenile officer. The purpose of the "notice" requirement is to permit, where possible, a parent to confer and counsel with the juvenile before interrogation and confession. *People v. Montanez*, 273 Ill. App. 3d 844, 652 N.E.2d 1271 (1995). There is authority that the Juvenile Court Act applies to a juvenile who is tried as an adult. *Montanez*, 273 Ill. App. 3d 844, 652 N.E.2d 1271; *People v. McGhee*, 154 Ill. App. 3d 232, 507 N.E.2d 33 (1987).

■ Factors to be considered in determining whether the confession was voluntary include the defendant's age, education, intelligence, experience and physical condition; the length and intensity of the interrogation; the existence of any threats, promises, or physical coercion; whether the confession was induced by police deception; and whether defendant was informed of his constitutional rights. *People v. Martin*, 102 Ill. 2d 412, 427, 466 N.E.2d 228 (1984); *People v. MacFarland*, 228 Ill. App. 3d 107, 117, 592 N.E.2d 471 (1992). When a juvenile's confession is at issue, additional factors come into play, including the time of day and the presence of a parent or other adult interested in the juvenile's welfare. *People v. Brown*, 235 Ill. App. 3d 479, 490, 601 N.E.2d 1190 (1992). Courts scrutinize custodial statements by juvenile suspects with particular care, given that the potential for coercion is enhanced. *Brown*, 235 Ill. App. 3d at 490.

Although the presence of a youth officer does not *per se* make a juvenile's confession voluntary, it is a significant factor. *In re Lashun H.*, 284 Ill. App. 3d 545, 557, 672 N.E.2d 331 (1996). The failure to have a juvenile officer present is material to determining the voluntariness of defendant's statement. *People v. Knox*, 186 Ill. App. 3d 808, 815, 542 N.E.2d 910 (1989). The presence or absence of a parent is also a factor in evaluating the voluntary nature of a confession. *People v. Montanez*, 273 Ill. App. 3d at 854; *In re J.O.*, 231 Ill. App. 3d 853, 855, 596 N.E.2d 1285 (1992). The relevant inquiry is whether the absence of an adult interested in the defendant's welfare contributed to the coercive circumstances surrounding the interview, not whether contact with a parent was denied. *Knox*, 186 Ill. App. 3d at 814. The trial court's finding that a confession was voluntary will not be overturned by the reviewing court unless it is against the manifest weight of the evidence. *Jones*, 156 Ill. 2d at 243; *Thomas*, 137 Ill. 2d at 516.

The following cases are helpful in deciding whether the confession in this case was voluntary. In the case of *People v. Montanez*, 273 Ill. App. 3d 844, 652 N.E.2d 1271, the court considered the factor

of "notice" that should be given to a parent and juvenile officer. The court stated:

> " 'Notice' here must be understood to have some purpose, namely, to allow, where possible, the concerned adult to confer and counsel with the juvenile before interrogation and confession. Yes, an attempt was made to contact a youth officer before the statement was taken; but the interrogation went forward anyway, within minutes. And yes, the parent here was 'notified,' but in the same breath she was told she could not see her child until called. These circumstances demonstrate the intended fulfillment of notice here was simply a tragic charade." *Montanez*, 273 Ill. App. 3d at 850.

*Montanez* further held that the failure to have the opportunity to confer was material in determining the voluntariness of a minor defendant's statement. 273 Ill. App. 3d at 852. The court held that the confession was not voluntary.

In the case of *In re J.O.*, 231 Ill. App. 3d 853, 596 N.E.2d 1285, a 12-year old respondent's parents went to the police station. However, the police testified that because the respondent's parents did not ask to talk to the respondent, they were not taken to see him. Instead, they waited in the police station lobby. The respondent was then interrogated. The court agreed that there is no *per se* rule that juveniles must be allowed to consult with their parents prior to questioning. Also, the voluntariness of a juvenile's confession is to be determined by the totality of the circumstances. Nevertheless, the court in *In re J.O.*, stated:

> "A juvenile's age and the fact that the interrogation occurred in the middle of the night may properly be considered in evaluating the voluntary nature of a confession. [Citation.] Additionally, if parents have indicated an interest by their presence, then they should be allowed to confer with their children before any questioning occurs. [Citation.] The presence or absence of a parent is a factor in evaluating the voluntary nature of a confession under the totality of the circumstances test. [Citation.] Accordingly, because the trial court's ruling was based on the totality of the circumstances and the court considered proper factors in making its determination, we affirm its granting of the motion to suppress." *In re J.O.*, 231 Ill. App. 3d at 855.

In the case of *People v. R.B.*, 232 Ill. App. 3d 583, 597 N.E.2d 879 (1992), the 15-year-old defendant maintained that his statement was involuntary. The court explained in deciding the case:

> "This court has stated that the failure to telephone a [juvenile's] parents, or the absence of a parent during questioning, is a factor in determining voluntariness, but is not determinative of whether defendant's confession should be suppressed. [Citations.] However,

where the State failed to take appropriate steps to ensure that a juvenile defendant had an opportunity to confer with an interested adult, either a parent or a youth officer, this court has held that the police conduct rendered his confession inadmissible. [Citation.]" (Emphasis omitted.) *R.B.*, 232 Ill. App. 3d at 593. The court then held that the confession was involuntary.

■ Considering the totality of the circumstances, we conclude that the trial court's determination that defendant's first confession given between 8:30 a.m. and 9 a.m. was voluntary was against the manifest weight of the evidence. Defendant was an emotionally disturbed 14-year-old person. He previously had been admitted to a psychiatric hospital and had attended Oak Therapeutic Day School and behavior disorder programs at five schools.

Most importantly, no adult interested in defendant's welfare was present during his initial interrogation when defendant first confessed to the police. The police officers testified that they initially interrogated defendant from 8:30 to 9 a.m., then contacted the youth officer at 9 a.m. The youth officer testified that she was introduced to defendant shortly after 9 a.m., but did not speak with him at that time. She returned to her office until the assistant State's Attorney arrived at 10:30 a.m. Although the youth officer was present during defendant's subsequent statement to the assistant State's Attorney, there was no evidence that she ever spoke with defendant alone at any time. Moreover, although defendant's mother was called, there was no evidence that the police tried to contact her before they questioned defendant at 8:30 a.m.

Therefore, we find the first confession involuntary. Because the confession should have been suppressed, we reverse the conviction and remand for a new trial without the first confession. However, the second confession, to the assistant State's Attorney, is admissible.

■ Because we are ordering a new trial, we will not discuss the jury, closing argument, or sentencing issues. We will, however, discuss whether the jury should have been instructed on the lesser-included offense of involuntary manslaughter since that issue may appear in the new trial.

It is well established that an instruction defining the lesser offense should be given if there is evidence in the record that, if believed by the jury, would reduce the crime to a lesser-included offense. *People v. Valdez*, 230 Ill. App. 3d 975, 985, 595 N.E.2d 1245 (1992).

There was no evidence in this case to warrant a jury instruction on involuntary manslaughter. A person commits involuntary manslaughter when he "unintentionally kills an individual without law-

ful justification ***[and] his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." 720 ILCS 5/9—3 (West 1992).

There was no evidence that this shooting was reckless or an accident, but only that the person shot was not the intended victim. That is not enough for an involuntary manslaughter instruction. Shooting and killing an innocent bystander when intending to shoot someone else is evidence of first-degree murder. If defendant had been shooting aimlessly out the car window at no one and shot someone by accident, that might be sufficient for an instruction on involuntary manslaughter. However, there was no such evidence in this case. Therefore, we reject defendant's contention.

Based on the foregoing, we reverse the circuit court judgment and remand for a new trial without defendant's first confession. Defendant's second confession, to the assistant State's Attorney, is admissible. For double jeopardy purposes, we conclude that the evidence presented at trial was sufficient for a jury to decide that defendant was guilty beyond a reasonable doubt. We are not making a finding as to defendant's guilt or innocence that will be binding in a new trial but, rather, our consideration of the evidence admitted at trial will protect defendant's constitutional right against double jeopardy. See *People v. Taylor*, 76 Ill. 2d 289, 309-10, 391 N.E.2d 366 (1979).

Reversed and remanded.

WOLFSON, P.J., and McNAMARA, J., concur.