Fourth Division

July 30, 1998

Nos. 1-97-1400, 1-97-1541 Cons.

THE PEOPLE OF THE STATE OF ILLINOIS, ) APPEAL FROM THE

) CIRCUIT COURT OF

Plaintiff-Appellee, ) COOK COUNTY.

)

v. )

)

CALVIN McNEAL and ANTOINE SCOTT, ) HONORABLE

) STANLEY SACKS,

Defendants-Appellants. ) JUDGE PRESIDING.

JUSTICE WOLFSON delivered the opinion of the court:

At about 2:20 a.m. on May 23, 1994, Dion Massey stood outside a submarine sandwich shop on the corner of 71st and Paxton in Chicago.  Suddenly there was a barrage of gun fire.  Soon after, the police arrived on the scene.  They found Dion Massey, unconscious, inside the sub shop.  He was bleeding from a bullet wound to the chest.  Outside the sub shop, the police found 2 bullet fragments, one lodged in the store's door casing.  On the southwest corner of the intersection, kitty-corner from the sub shop, the police found 14 9mm. shell casings.

There were no eyewitnesses to the shooting, but the investigation led police to believe the shooting was gang-related.  A number of Mickey Cobra (MC) gang members were brought to the police station for questioning.  After a month-long investigation, three members of the MCs were indicted by the June 1994 grand jury -- Calvin "Pookie" McNeal, Michael "Pigtail" Keene, and Antoine "Goofy" Scott.  All three defendants were charged with two counts of first degree murder.

Separate but simultaneous bench trials were held for the three defendants on January 8, 1997.  McNeal and Scott were found guilty as charged.  Each was sentenced to a term of 28 years imprisonment.  Keene was acquitted.

McNeal and Scott appeal their convictions.  Both defendants contend the trial court erred by refusing to suppress their inculpatory post-arrest statements to police.  In addition, McNeal and Scott argue they were not proved guilty beyond a reasonable doubt.  We affirm.

SCOTT'S MOTION TO SUPPRESS

On November 29, 1995, the trial court held a hearing on Scott's motion to suppress his post-arrest statements.  At this hearing Detective McCann testified that he and his partner, Detective Caesar, arrested Scott at about 7:45 p.m. on June 8, 1994.  Scott, who was 16 years old, was arrested at 7336 S. Luella in Chicago, his grandparents' home.  The detectives did not have a warrant for Scott's arrest.

When the police arrived, Scott's grandparents were home.  The police invited them to accompany Scott to the police station.  Scott's grandfather declined.  He said he had to go to work.  Scott's grandmother also declined to accompany Scott.  Her reasons were health-related.  It was reported that she suffered from bronchitis and epilepsy.

At the station, Detective McCann attempted to obtain a youth officer.  None was available.  Detective McCann then met with Scott briefly (about 5 minutes).  At this time, Scott denied any participation in the Massey shooting.  Scott was told, however,  the police had information to the contrary.  Detective McCann denied reading to or providing Scott with any of the statements implicating him.

After the brief interview, Scott was left alone in an interview room to await the arrival of an assistant State's Attorney.  ASA Hal Garfinkle arrived at Area 2 at about 9 p.m.  He did not speak with Scott until a youth officer became available.  At about 10:30 p.m., Youth Officer Burke came to the station and met with Scott.  ASA Garfinkle then spoke with Scott in the presence of Youth Officer Burke.  At this time Scott gave a detailed oral statement implicating himself in the shooting.

In his statement, Scott said he met Carney Wiggins on the way to school on May 19, 1994.  Carney told him his brother, Michael Wiggins, had been shot the night before.  Carney said a gang meeting was planned for that evening.  After school that afternoon, Scott went to the cleaners and met Jerome Watson along the way.  While Scott was inside the cleaners he heard gunshots outside the cleaners.  When he looked out he saw members of the Gangster Disciples, dressed in black, running in one direction.  Jerome Watson and some other MCs were running in the opposite direction.

Later, at about 6:30 p.m., Scott was on his way to Rosenbloom Park when he saw Jerome Watson again.  Watson told Scott the meeting was over.  Watson told him they were going on a mission to "burn" some GDs.  Scott accompanied Watson to Dante Eatmon's house.

Scott also told police he returned to Eatmons' house on May 23, 1994.  Michael Keene and Sam Smith were there.  Smith stole a white car and Scott got in the car with Keene and Calvin McNeal.  As they headed for GD territory, however, the car broke down.  They all went back to Dante's house.  A friend named Marcus came to Dante's with a dark colored car.  This time four-five more MCs got into the car and drove with them to GD territory.  They parked at 71st and Merrill.  Scott said he was told to stay with the car and open the doors when the others returned from their mission.  Scott admitted he had acted as a lookout while the others walked down an alley toward 71st and Paxton.  He heard shooting, then the MCs ran back to the car and they all left the area.

Although Scott provided this oral statement to both the police and the assistant State's Attorney, he declined to have his statement memorialized in any way.

Scott testified in support of his motion to suppress.  He agreed that his grandparents had been present when he was arrested, and that they declined to go with him to the police station.  Scott claimed, however, that he told the detectives his mother lived down the street, but the detectives did not respond.

Scott also contended that when the police questioned him at the station and informed him of his "right to counsel," he told the detectives he didn't understand what this meant.  The detectives didn't explain and questioned him anyway.

Scott denied having any personal knowledge of the shooting.  He said he learned the details of the shooting from statements the police had obtained from other persons and read to him.  He said he initially denied any involvement in the shooting, but the detectives called him a liar.  Then, Scott claimed, the detectives told him he would spend the rest of his life in jail unless he told them he acted as a look-out.  Scott said the detectives told him if he admitted being a look-out he could go home.  This was the only reason, Scott said, he made the admission that he had been a look-out at the shooting.

Scott agreed that he gave ASA Garfinkle a statement implicating himself in the shooting.  He said he was afraid to tell ASA Garfinkle the truth.

On cross-examination, Scott admitted his grandmother was his legal guardian.  He had been living with his grandparents since April 1994.  Scott also admitted that he had been arrested a number of times prior to this arrest.  He had been informed of his rights each time in the past.  He never said he didn't understand his rights.

The trial court denied Scott's motion to suppress.  The court found that the police complied with the statutory requirement of giving notice to the minor's guardian of the arrest.  The court also found that the legal guardians were given sufficient opportunity to be present at Scott's questioning, but that they chose not to attend.  In addition, Scott did not give an inculpatory statement until after he met with a youth officer.  He made the statement to ASA Garfinkle, in the presence of the youth officer. 

The court found Scott's rights as a juvenile were sufficiently protected.  The court said it gave no credence to Scott's claims that he did not understand his rights and that he was threatened with life imprisonment unless he made an admission.

MCNEAL'S MOTION TO SUPPRESS

On December 4, 1995, the trial court held a hearing on McNeal's motion to suppress his oral and written post-arrest statements.  At the hearing Detective Louis Caesar testified he and his partner, Detective McCann, arrested McNeal at about 9 a.m. on Sunday morning, June 12, 1994.  He and Detective McCann went to 7420 S. Jeffery, to the home of McNeal's grandmother, Mrs. Jennie Alexander.  They had a warrant for McNeal's arrest on a charge of murder.  The detectives told Mrs. Alexander about the warrant and said they were taking McNeal into custody for further questioning.

Because McNeal was 16 years old, Detective Caesar said, they invited Mrs. Alexander to accompany her grandson to the station.  She declined.  She said she was going to church and would come to the station when she was done.

The detectives took McNeal to Area 2 and left him in an interview room while they went to arrest Michael Keene.  When they returned to Area 2, at about 10:45 a.m., ASA Kirby was already at the station.

ASA Kirby asked the detectives the whereabouts of McNeal's grandmother and suggested they telephone her since she had not yet arrived at the station.  When Detective Caesar called, however, there was no answer at Mrs. Alexander's home.

Because they could not reach Mrs. Alexander, a youth officer was summoned.  At about 12:00 p.m., a youth officer arrived.  McNeal was not interviewed until the youth officer had an opportunity to speak with McNeal.  At about 12:30 p.m., ASA Kirby met with McNeal in the presence of Detective Caesar and the youth officer.  McNeal gave an oral statement, admitting his involvement in the shooting of Dion Massey.  McNeal told them he did not shoot at Massey, but acted only as a look-out.

McNeal agreed to give a written statement.  ASA Kirby wrote out McNeal's statement, based on answers McNeal gave to questions ASA Kirby asked.  When the statement was finished, McNeal reviewed and signed it.  The written statement contained both 
Miranda
 warnings and juvenile warnings.

The written statement, though admitted into evidence, was not made a part of the appellate record.  We, however, have been able to glean certain portions of the statement from McNeal's cross-examination.

McNeal told police he graduated from Bryn Mawr grade school and was a sophomore at South Shore High School.  He said he learned that Mike Wiggins, also known as Mike Sconey, had been shot on May 18, 1994.  He knew the MCs believed the shooting was done by the GDs.  On May 19, 1994, a gang meeting was held at the park.  It was decided at this meeting that McNeal, Antoine Scott, Michael Keene, and Jacob Elzie would go on a mission to retaliate against the GDs.  McNeal told police that the four of them dressed in black on the evening of May 22, 1994.  Keene had a .38 hand gun and Elzie had a 9mm.  They met at the park.  Elzie stole a dark colored car and they drove to GD territory.  McNeal said he sat in the back of the car with Scott.  Elzie drove with Keene in the front passenger side.  They drove past the sub shop at 71st and Paxton, then parked down the street.  Elzie and Keene got out, walked to the corner, and fired shots at Massey, who was standing on the opposite corner.  McNeal said he and Scott stayed with the car and opened the doors when Elzie and Keene ran back to the car, shouting, "I got him."

On cross-examination, Detective Caesar admitted that June 12, 1994, was not his first contact with McNeal.  On May 26, 1994, at about 1:45 p.m., Officer Peck, who was patrolling the area near 73rd and Jeffery (acknowledged MC territory), saw McNeal and asked him to come to the station for questioning.  McNeal was taken to the police station at 71st and Cottage Grove, where he was questioned briefly.  There was no youth officer present at this time and no attempt was made to contact McNeal's guardian.

After this first interview, Detectives McCann and Caesar were called.  They came to the station and spoke with McNeal briefly.  Again, there was no guardian or youth officer present.

The detectives drove McNeal past the scene of the shooting before taking him to Area 2 headquarters.  At Area 2, the detectives interviewed McNeal at 7 p.m. and again at 10:20 p.m.  During the second interview, Detective Caesar said, McNeal's grandmother was present.  At about 11 p.m., McNeal was allowed to go home.  These events took place on May 26th.

The next evening Detective Caesar went to McNeal's home and asked him to come back to the station for more questioning.  McNeal's grandmother was home, but she did not accompany Calvin to the station.  She said she would come to the station later that evening.

At Area 2, though McNeal was not placed under arrest, Detective Caesar informed McNeal of his rights pursuant to 
Miranda
.  At about 9 p.m., Detective Caesar began questioning McNeal.  Subsequently, Assistant State's Attorney (ASA) Kirby was called to come to the station and speak with McNeal.  At this time a youth officer was summoned.  Youth Officer Fogarty came to the station and met with Calvin prior to his interview with ASA Kirby, which took place at about 12:30 a.m.  At about 2 a.m., May 28, 1994, Calvin was allowed to leave the station with his grandmother.

ASA Kirby testified at the hearing.  He said he arrived at Area 2 headquarters at about 10 a.m. on June 12, 1994.  Before speaking with McNeal he attempted to contact McNeal's grandmother.  When she could not be located, a youth officer was summoned.  After the youth officer arrived, at about 12:30 p.m., ASA Kirby met with McNeal, informed him of his rights, including his juvenile rights, and took McNeal's written statement.

ASA Kirby testified that McNeal told him he could read and write and had graduated from high school.  He said McNeal was alert, responsive, and coherent.  He said McNeal read and understood the statement.  McNeal affixed his initials to each page as they reviewed it together.

Mrs. Alexander testified at the hearing on McNeal's behalf.  She said she was McNeal's legal guardian since he was two years old.  It was stipulated that McNeal was classified in school as EMH -- educable mentally handicapped.  She admitted, however, McNeal had no difficulty communicating.

Mrs. Alexander said she knew about the police questioning her grandson May 26, 1994.  She said a relative called her at work at about 1:30 or 2:00 p.m. and told her McNeal was taken to the police station.  She said she remained at work until 5 p.m., went home, ate supper, and then "sat around" watching television until about 8 p.m. before going to the police station.  At the station, however, she said she was not allowed to see her grandson until about 1 a.m., just before they let her take him home.

On the following evening an officer came to her house and asked to speak to her grandson again.  She said the officer told her that her grandson was involved in a murder and had to go to the station for questioning.  The officer told her she could go with him to the station, but she decided to go later on.  She didn't state when it was that she arrived at the station, but she claimed when she did arrive she was once again kept from seeing her grandson.  She said she wasn't allowed upstairs, where her grandson was being questioned, until 5 to 10 minutes before the police let McNeal leave, at about 2 o'clock in the morning.

Mrs. Alexander admitted she was asked to accompany McNeal to the police station on June 12, 1994, and she declined the offer.  She also admitted she stayed at church until 4 o'clock that afternoon and never attempted to go to the police station after she was finished with church.  She claimed, however, the detectives never told her they had a warrant for McNeal's arrest.  She said she thought McNeal was just being taken in for more questioning.  She said she asked the detectives if she needed a lawyer and they told her, "No."

McNeal also testified.  He said he had been taken into custody on three occasions -- May 26th, May 27th, and June 12, 1994.  On May 26, McNeal said, the police picked him up on the street.  He told his Aunt Jerry that he was going to the police station.  At the station, he talked with police officers and then, later on, with two detectives who were called to the police station at 71st and Cottage Grove.  The detectives drove him past the scene of the shooting and then to Area 2.  At about 1 a.m., he was allowed to leave the station with his grandmother.

On May 27, the detectives came to his grandmother's house at about 5 p.m. and took him to Area 2.  He said he was not questioned by the assistant State's attorney until he met with a youth officer.  Then, in the presence of the youth officer, he was questioned by the State's attorney.

On June 12, 1994, McNeal said the detectives came to his grandmother's house again.  The detectives did not tell him he was under arrest.  McNeal also said the assistant State's Attorney spoke with him before a youth officer arrived.  Once the youth officer arrived and spoke with McNeal, a second interview was conducted by ASA Kirby, in the presence of the youth officer.  It was then that McNeal gave his statement to ASA Kirby.

McNeal said ASA Kirby wrote down "stuff" that was not what he said.  McNeal said he didn't read the statement and didn't know what it said.  McNeal also claimed he was told if he signed the papers he would be allowed to go home.

On cross-examination, however, McNeal said on each occasion he was taken to the police station he went voluntarily.  He also said he never was mistreated by the police.  He said he was given food and drink and allowed to use the washroom.  McNeal also admitted he told the police he was a look-out during the shooting.

After all the evidence was heard and arguments given, the court took the matter under advisement.  One week later, on December 11, 1995, the court entered its ruling.  The court determined that reasonable efforts were made to ensure that the minor's guardian was notified and, on each occasion, the lack of the guardian's presence was due mainly to the conduct of the guardian.

The court ruled, in view of the totality of the circumstances, McNeal's oral and written post-arrest statements were "freely and voluntarily given without compulsion."  The motion to suppress was denied.

TRIAL
 

Separate but simultaneous bench trials were held for the three defendants before another judge on January 8, 1997.  At trial it was established that Dion Massey was shot in the chest as he stood on the corner of 71st and Paxton on May 23, 1994.   After the shooting police recovered 14 9mm. shell casings from the sidewalk across the street.

The State presented the testimony of Jerome Watson.  Watson admitted to being a member of the Mickey Cobras (MCs).  He said in 1994 he had been with the gang for 5½ years and held the rank of "Supreme Serpent." 

Watson testified to the following uncontroverted facts:  the Vice Lords and the MCs are affiliated gangs and both are rivals of the Gangster Disciples (GDs); Michael Wiggins was a member of the Vice Lords and Michael's  brother, Carney, was a member of the MCs; on May 19, 1994, Michael Wiggins was shot and killed while he was in MC territory, near 73rd and Jeffery; the MCs believed the GDs were responsible for Wiggins' shooting; and, on May 23, 1994, Dion Massey was shot and killed as he stood on the corner of 71st and Paxton, which is where the GD's territory begins.  Watson also agreed that all three defendants were members of the MCs.  He said Calvin McNeal's gang name was "Pookie," Michael Keene's gang name was "Pigtail," and Antoine Scott's gang name was "Goofy" or "Goof Snake."

Watson denied having any personal knowledge regarding the shooting of Dion Massey.  Though he admitted that on June 1, 1994, he gave the police a written statement and testified before the grand jury, he denied the information contained in the statement or his testimony was true.  He denied he told police that on May 19th, the day after Michael Wiggins was shot, he had a confrontation with some GDs while walking home from school near 73rd and Euclid.  He denied he said the GDs told him, "Tell your brother to rest in hell."  He admitted Hoogie was a "minister" of the MCs, but denied Hoogie called a gang meeting for the evening of May 19, 1994, to plan a retaliation mission against the GDs.  He denied he attended the meeting at Rosenbloom Park (also known as South Shore Park).  He denied he told the police "Hoogie" asked for volunteers to retaliate for Michael's killing and that the three defendants volunteered to perform the mission.

Watson recanted the rest of his written statement in its entirety.  However, the statement and Watson's grand jury testimony were admitted as substantive evidence.  Though the written statement and grand jury transcript have not been included in the appellate record, it appears, based on Watson's cross-examination, Watson told police the retaliation mission was originally set for May 20th, but there were too many police officers in the area that evening and the mission was called off.  The following night Keene was unavailable.  On the evening of May 22nd, however, Pookie, Pigtail, and Goofy came to Watson and asked him to obtain guns for them so they could proceed with the mission.  Watson went to 73rd and Jeffery and obtained three handguns: a 9mm., a 38 caliber, and a .25 caliber.  The guns were concealed in a purple velvet Crown Royal liquor bag.  Watson turned over the guns to the three gang members at the park.  Pookie, Pigtail, and Goofy were dressed in black for the mission.  The plan was for someone to steal a car and drive to GD territory.

Watson's statement also said the next day Watson saw Calvin (Pookie), who told him, "We got 'em."  Later that same day Pigtail returned the guns to Watson and told him, "We took care of the nation."  Pigtail and Pookie fired the shots, Watson was told, while Goofy acted as a lookout.

Watson's testimony before the grand jury on June 1, 1994, apparently was consistent with his written statement to the police.   At trial, however, Watson denied he was asked certain questions or that he gave certain answers.

In addition to Jerome Watson's trial testimony and the admission of his earlier statements and grand jury testimony as substantive evidence, the court heard testimony from Detectives McCann and Caesar regarding the defendants' post-arrest statements.  McNeal's written statement was admitted into evidence.

In Scott's defense, Robert Scott, Antoine's grandfather, testified.  He said Antoine had been home on the evening of May 22, 1994.  The grandfather said he went to bed at 11:00, while Antoine was watching television.  He also said Antoine could not have left the house because the doors were locked from the inside and Antoine didn't have a key.

Antoine Scott testified.  He said he never left his grandparents' home on the night of the shooting and had no personal knowledge about it.  He admitted he told police he acted as a look-out, but said he only told police that because they told him he could go home if he made the admission.  He said the only information he had about the shooting he got from memorizing information from statements the police had shown him.

As impeachment, the State called Detective McCann, who testified that no other statement in the possession of the police said that nine gang members went to the crime scene.  Only Scott's statement contained this information.

McNeal also testified at trial.  He claimed the detectives who took him to GD territory on May 26, 1994, to view the scene of the shooting threatened to leave him there if he didn't give a statement admitting his involvement.  Nonetheless, he said, he refused to say anything.  The police brought him back to the station.  He said he sat in the station for eight hours without ever saying anything to anyone and then was let go.

McNeal said he was brought back to the station on May 27th.  Again, he said, he remained in the station for four-five hours without ever giving any statements.  Then he was let go.

McNeal admitted he gave a statement to police and a written statement to the assistant State's attorney on June 12, 1994.  He claimed, however, he had no personal knowledge of the shooting and only signed the statement because he was told if he did he would be let go.

On cross-examination, McNeal said the information in the statement was made up.  Later, he claimed Detective Caesar told him what to say.  But McNeal admitted ASA Kirby asked him questions and he gave answers, which the ASA wrote down.  McNeal also identified his signature on the statement and said he understood his rights.  He said he could read and write, but didn't read the statement after ASA Kirby wrote it and didn't know what it said.

Both McNeal and Scott were found guilty of murder on an accountability theory.  Each was sentenced to a term of 28 years imprisonment.

DECISION
 

McNeal and Scott question the trial court's rulings denying their motions to suppress their inculpatory post-arrest statements.  Since both McNeal and Scott were 16 years old at the time their statements were taken, we must consider the issue of voluntariness in the special context afforded to minors.

We understand "the receiving of an incriminating statement by a juvenile in the absence of counsel is a sensitive concern requiring great care to assure that the juvenile's confession was neither coerced, suggested, nor the product of fright or despair."  
People v. Fuller
, 292 Ill. App. 3d 651, 653, 686 N.E.2d 6 (1997), quoting 
People v. Prude
, 66 Ill. 2d 470, 476, 363 N.E.2d 371 (1977).  A confession will be admissible only if it was made freely and voluntarily and if no direct or implied promises have been made or improper influence applied.  
Fuller
, 292 Ill. App. 3d at 653.  Even when a juvenile is concerned, however, a court looks to the totality of the circumstances to determine whether a confession is voluntary.  
In re Lamb
, 61 Ill. 2d 383, 388, 336 N.E.2d 75 (1975); 
People v. Gardner
, 282 Ill. App. 3d 209, 218, 668 N.E.2d 125 (1996).

Factors to be considered when determining voluntariness are: the defendant's age, education, intelligence, experience, and physical condition; the duration of the questioning; whether he was advised of his constitutional rights; whether he was subjected to any threats, promises, or physical or mental coercion; and whether the confession was induced by police deception.  
People v. Oaks
, 169 Ill. 2d 409, 447, 662 N.E.2d 1328 (1996); 
People v. Fuller
, 292 Ill. App. 3d at 654. 

For juveniles there are some additional considerations: the time of day when questioning occurred and the presence or absence of a parent or other adult interested in the minor's welfare.  
In re J.E.
, 285 Ill. App. 3d 965, 974, 675 N.E.2d 156 (1996); 
People v. Brown
, 235 Ill. App. 3d 479, 490, 601 N.E.2d 1190 (1992).  The benchmark for voluntariness, however, is whether the defendant's will was overborne at the time, not whether he would have confessed in the absence of interrogation.  
People v. Brown
, 169 Ill. 2d 132, 144, 661 N.E.2d 287 (1996).

The police have a statutory duty, where a minor is  concerned, to make a reasonable attempt to notify the minor's parents or guardian at the time the minor is taken into custody.  The statutory requirements are set forth in section 5-6 of the Juvenile Code (see 705 ILCS 405/5-6(1) and (2) (West 1994)). 

There is nothing in the statute which mandates that a parent or guardian be given an opportunity to speak with the minor before questioning or that the parent or guardian be present at the time the minor is questioned.  Nor does the statute require that the minor be seen by a youth officer before questioning.  Illinois courts have consistently rejected any 
per se
 rule which would require a minor be given such opportunity.  See cases cited in DiVito dissent, 
People v. Montanez
, 273 Ill. App. 3d 844, 857, 652 N.E.2d 1271 (1995). 

Still, courts have held where an officer questioning a juvenile learns of a parent's presence in the station, the officer has an affirmative duty to stop questioning and allow the parent to confer with the minor.  See 
People v. Brown
, 182 Ill. App. 3d 1046, 538 N.E.2d 909 (1989).  Failure to comply with this judicial directive, though a significant factor in the determination of voluntariness, does not compel a finding that the confession was involuntary.  See 
In re Lashun H.
, 284 Ill. App. 3d 545, 553-54, 672 N.E.2d 331 (1996); 
People v. Bobe
, 227 Ill. App. 3d 681, 702-03, 592 N.E.2d 301 (1992). 

By the same token, notification of a parent or guardian or the presence of a youth officer at the time of questioning, does not automatically make the confession voluntary.  
In re Lashun H.
, 284 Ill. App. 3d at 555. 

Parental notification and/or consultation with a youth officer are but two factors to be considered when evaluating the totality of the circumstances.

Finally, a reviewing court must remember it does not reweigh the evidence when deciding whether the trial court properly denied a motion to suppress -- a motion to suppress will be reversed on appeal only when it is shown that the trial court's determination was against the manifest weight of the evidence.  
People v. Marts
, 266 Ill. App. 
3d 531, 539, 639 N.E.2d 1360 (1994).  Each case must be evaluated based on its own particular set of circumstances.  
People v. Bernasco
, 138 Ill. 2d 349, 562 N.E.2d 958 (1990).

Voluntariness of Scott's Oral Statement

Scott was arrested at 7:45 p.m. on June 8, 1994, at the home of his grandparents, who are his guardians. It is undisputed that the detectives who arrested Scott invited the grandparents to accompany them to the station.  The grandparents declined.

At the station, no youth officer was available.  Detective McCann spoke with Scott for 5-10 minutes, at which time Scott denied involvement in the shooting.  McCann said he informed Scott that others had implicated him, but showed Scott no reports or statements.

Scott was next interviewed at 10:30 p.m., when ASA Garfinkle and Youth Officer Burke were present.  At this time Scott gave a detailed statement.  He admitted to being a lookout during the shooting.  His statement contained details which no one else had provided to the police.  Scott refused to memorialize the statement in any way.

Scott was 16 years old at the time the statement was made to the police and State's Attorney.  He had been attending high school and was of at least average intelligence.  He was an admitted gang member.  He was street wise.  He had been arrested a number of times before June 8th.  The questioning occurred at 10:30 p.m. and he had been in custody only since 7:45 p.m., less than three hours.  Scott was advised of his constitutional rights.

Though Scott claimed he did not understand his rights and was induced to make the statement because of promises made by the police, the trial court chose to reject this testimony as unbelievable.  The trial court is in a better position to assess the credibility of a witness.  It is the trial court's province to resolve any conflicts and determine whether a statement was coerced.  
People v. Bobe
, 227 Ill. App. 3d 681, 592 N.E.2d 301 (1992).  In this case, we cannot say the court's conclusion that Scott was less than forthright requires reversal.

We realize Scott's guardians were not present at the time of questioning.  However, a youth officer was present.  Neither of these facts is dispositive, however, on the decision of voluntariness.  They are factors to be considered.  This is not a case where evasive police conduct frustrated a parent's attempt to confer with his child before or during questioning.  
In re L.L.
, --- Ill. App. 3d ---, 693 N.E.2d 908 (1998).

In viewing the totality of the circumstances we hold the trial court's conclusion that Scott's statement was voluntary was not against the manifest weight of the evidence. 

We affirm the trial court's decision to deny the motion to suppress Scott's post-arrest statements.

Voluntariness of McNeal's Statements

The circumstances in McNeal's case are different than those in Scott's case.  McNeal was taken into custody and questioned by police on two occasions before his arrest on June 12, 1994.  On June 12th, however, the police had a warrant for McNeal's arrest.  McNeal was taken into custody before 9 a.m. on a Sunday morning.  His grandmother, Mrs. Alexander, was home and informed by the officers they had a warrant for McNeal's arrest.  Mrs. Alexander was invited to come to the station, but she decided to go to church.  Church for Mrs. Alexander was an all-day affair.  It lasted until 4 p.m.  She never called the station to make an inquiry, nor did she go to the station after church services were over.

McNeal was taken to the police station and, by his own account, went willingly.  At the station, McNeal was left alone in an interview room while another suspect, Michael Keene, was arrested.  At 10:45 a.m. a youth officer was summoned since Mrs. Alexander had not yet appeared at the station and could not be reached.  McNeal was not questioned by the police or ASA Kirby until a youth officer was on the scene and had an opportunity to speak with McNeal.  After meeting with the youth officer, McNeal made oral and written statements to the police and the assistant State's Attorney, implicating himself in the shooting as a lookout.

It was stipulated at the suppression hearing that McNeal was designated EMH (educable mentally handicapped) at school and was below average in his ability to grasp certain school subjects such as reading.  Mrs. Alexander testified at the hearing that the detectives never told her McNeal was under arrest.  She also said, however, she asked if an attorney was necessary and the detectives said, "No."

McNeal testified at the hearing, claiming he didn't know what was contained in his written statement because the State's Attorney just wrote down "stuff."  He said he signed the papers, without reading them, because the police said he could go home if he signed them.  He later admitted, however, he told the police he acted as a lookout during the shooting.

Again the trial court ruled that the statements were admissible under the totality of the circumstances.  McNeal was 16 years old at the time he gave his statement.  Though his intelligence was below average, his demeanor and testimony indicated to the trial court that he had sufficient communication skills and comprehension to have made a knowing and intelligent waiver of his rights.  We agree.

McNeal was advised of his constitutional rights and he said he understood them.  When his attorney attempted to check his understanding of the word "voluntary," McNeal was able to give a correct definition.  Nothing in the record causes us to reject the trial court's finding that McNeal's scholastic handicap did not prevent him from making a knowing and voluntary waiver of his rights.

Furthermore, McNeal's demeanor was that of a street-wise gang member who had prior experience with the law.  He did not appear to be frightened or despairing when he gave his statement. He admitted he was given food and drink and was allowed to use the washroom.  It was his perception, according to his testimony, that he was never mistreated or "tricked" by the police.  This scenario does not project an atmosphere in which McNeal's statement was made as a result of his will being overborne.   

We realize McNeal was taken into custody on two prior occasions.  Though statements he made during these times were not offered into evidence, it appears McNeal gave the police information which indicated he had some knowledge about the shooting.  To what extent these prior police contacts influenced his later decision to make inculpatory statements cannot be easily assessed.  However, we note McNeal's acknowledged willingness to accompany the police on each occasion.

The fact that McNeal was sometimes questioned on these earlier occasions outside the presence of a guardian or youth officer, though troubling, does not mandate a finding that McNeal's subsequent statements were made involuntarily.  It was undisputed that McNeal's guardian, Mrs. Alexander, knew that McNeal had been taken into custody on May 26, 1994, yet made no attempt to rush to his side.  She worked the rest of the day, went home, ate, and watched television before going to the police station.  Though she denied it, the detectives said Mrs. Alexander was allowed to sit in on a 10 p.m. interview with McNeal.

Mrs. Alexander admitted she was aware that the police were questioning McNeal about his involvement in a murder, a serious offense.  Yet on May 27, 1994, when the police came to her house and took McNeal into custody again, she did not accompany him to the station.  Instead, she planned to go to the station later that night.  The time she actually arrived at the station was never established.  These circumstances do not compel a finding that Mrs. Alexander was prevented from being with her grandson.

Furthermore, whether Mrs. Alexander was actually prevented from seeing McNeal once she arrived at the station on May 27, 1994, is not a pivotal issue.  The relevant inquiry is whether deterring the guardian from being present during the questioning on May 27th contributed to a coercive detention on June 12th.  
People v. Fuller
, 292 Ill. App. 3d 651, 654, 686 N.E.2d 6 (1997).   Based on McNeal's own testimony, it does not appear the atmosphere was overtly coercive.  The absence of McNeal's grandmother during McNeal's questioning on May 27, 1994, does not compel us to find the statements he made on June 12, 1994, were involuntary.  There may be an occasion where repeated police pickups of a juvenile can create a coercive atmosphere, but that is not what happened in this case.

We find the trial court's ruling on McNeal's motion to suppress was not against the manifest weight of the evidence.

Sufficiency of the evidence

Our final inquiry is whether the record contains sufficient evidence from which the trier of fact could find defendants guilty of murder beyond a reasonable doubt.

The defendants' admissions provide significant evidence in support of a finding that both defendants are guilty of murder on an accountability theory.

In addition to the defendants' own admissions, however, the State also produced the written statement and grand jury testimony of a fellow gang member, Jerome Watson.  Although Watson recanted his earlier statements and grand jury testimony, the trial court admitted them as substantive evidence under section 115-10.1 of the Criminal Code.

The trial judge, acting as trier of fact, was entitled to believe Watson's earlier statements and grand jury testimony implicating both McNeal and Scott, rather than believe his trial testimony.  See 
People v. Gaston
, 259 Ill. App. 3d 869, 631 N.E.2d 311 (1994); 
People v. Johnson
, 255 Ill. App. 3d 547, 626 N.E.2d 1073 (1993).  Furthermore, despite some discrepancies, Watson's statement and grand jury testimony were substantially corroborated by McNeal's written statement and Scott's oral statements.

All parties agreed to the basic premise -- the shooting of Dion Massey on GD territory was done in retaliation for the shooting of Michael Wiggins and a gang meeting was held on May 19th, at which time McNeal and Scott joined in the objective -- to go on a mission to "burn" some GDs.  Each statement verified that McNeal and Scott were members of the retaliation mission on May 23, 1994, which resulted in the death of Dion Massey.

We hold the trial judge's finding that both McNeal and Scott were guilty of murder beyond a reasonable doubt was supported by the evidence.

CONCLUSION

We affirm Antoine Scott's and Calvin McNeal's convictions and sentences for the murder of Dion Massey.

AFFIRMED.

McNAMARA and SOUTH, JJ., concur.