THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANDREW BALL, Defendant-Appellant.

First District (2nd Division)   No. 1—98—2473

Opinion filed April 17, 2001.—Rehearing denied June 11, 2001.

Michael J. Pelletier and Michael H. Orenstein, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Miles J. Keleher, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McBRIDE delivered the opinion of the court:

Following a bench trial, defendant Andrew Ball was found guilty of first degree murder and was sentenced to 35 years in prison. Defendant now appeals, contending that the circuit court erred in denying his pretrial motions to suppress statements and to quash arrest, and applied an incorrect standard in deciding his motion to quash arrest. Defendant also maintains that the mittimus should be corrected to reflect an additional two days of credit for time served in pretrial custody.

One-year-old Jasmine Williams died on July 15, 1995. An autopsy was performed the following morning. The autopsy revealed that the victim had extensive internal injuries. Her liver had been torn in two, her adrenal gland had been torn, and there were contusions or hemorrhages of the soft tissue around the kidney. There was also internal bruising on the victim's head. The medical examiner found the injuries were consistent with someone punching the victim in the stomach in a violent manner with "a lot of force." It was determined that the victim had died as a result of internal bleeding caused by the blunt trauma.

Twenty-year-old Takesha Williams was the victim's mother and defendant's girlfriend. Defendant, who was 15 years old at the time of the murder, was not the victim's father. After learning from the autopsy that the victim had sustained her injuries sometime in the 24 hours preceding the autopsy, the police contacted Takesha's aunt and

asked that Takesha come down to the police station at 8 p.m. on July 16. The police did not request that defendant come to the police station. Takesha, however, wanted defendant to accompany her and he eventually agreed to do so. At 4:30 a.m. on July 17, defendant was arrested for first degree murder after making incriminating statements to police.

Prior to trial, defendant filed a motion to quash arrest and suppress evidence and a motion to suppress statements. Hearings were held on the motions and the motions were denied. A bench trial was then held and defendant was found guilty of first degree murder.

The evidence presented at the hearings on defendant's pretrial motions and at trial established the following.

Chicago police detective Greg Pittatsis testified that on July 16, 1995, defendant and Takesha Williams came into the police station at approximately 8 p.m. Pittatsis did not ask defendant to come to the police station. Pittatsis stated that, upon arriving at the station, defendant and the others were placed in a conference room. Defendant and Takesha were then separated so they could be interviewed. Between 8 p.m. and 4:30 a.m., defendant was moved between the conference room and a "regular office" in the violent crimes area of the station. Detective Pittatsis spoke with defendant six times during that time period. He also spoke separately with Takesha six times during that same period. According to Pittatsis, Takesha told him that she had spanked the victim approximately seven times on the arm and five times on the leg in quick succession and that when the victim continued to cry, Takesha took the victim by the arms, shook her and yelled "shut up" approximately five times. Takesha was then arrested at approximately 11:30 p.m.

Detective Pittatsis testified that his first interview with defendant lasted approximately one hour and his second interview lasted approximately 30 minutes. According to Pittatsis, Assistant State's Attorney (ASA) Susan Miller arrived at about 11:40 that evening, following the arrest of Takesha, and was present for all but the first two interviews with defendant. At about 4:30 a.m. on July 17, ASA Miller was about to take a statement from defendant as a witness when defendant asked what was happening with Takesha. When he was advised that she was under arrest for murder, defendant responded that he now wanted to tell the truth about what had happened. At that time, Pittatsis testified, questioning was stopped and he left the office to call defendant's mother. Detective Pittatsis reached defendant's mother by telephone but she declined to come down to the station. Pittatsis then requested a youth officer. Shortly before 5 a.m., youth officer McCluskey arrived. After being told defendant's mother would

not come to the station, youth officer McCluskey called her himself and was told that she would not come to the station. Pittatsis, McCluskey, Miller, and Pittatsis' partner, Detective Schorsch, then spoke with defendant, who was not handcuffed. Miller orally advised defendant of his *Miranda* rights. Miller advised defendant that due to the type of crime he was involved in he could be charged and tried as an adult. Defendant indicated he understood and then proceeded to give an oral statement confessing to striking the victim with his fist a number of times because she would not stop crying. That statement was subsequently reduced to writing and signed by defendant.

According to Detective Pittatsis, defendant was treated as a witness rather than a suspect until 4:30 a.m. when he made incriminating statements. Defendant was not handcuffed at any time and was always in unlocked rooms. Defendant never asked to use the telephone. Detective Pittatsis knew that defendant was 15 years old but did not ask defendant if he wanted to call his mother. Pittatsis testified that defendant was not offered food or drink because he was being interviewed as a witness and witnesses were not offered such things. According to Pittatsis, defendant was free to leave at any time prior to making his incriminating remarks at 4:30 a.m. Pittatsis never informed defendant that he was free to leave because defendant was there voluntarily. Pittatsis acknowledged that, sometime during the evening, he asked defendant if he would be willing to take a lie detector test to verify the information that he was giving about Takesha.

ASA Miller testified that on July 16, 1995, at around 11:30 p.m., she responded to a call from the area three detective division. After speaking with Detectives Schorsch and Pittatsis, she spoke with Takesha and defendant separately. She was informed that defendant was being treated as a witness. Although Miller was unable to recall the length of her first conversation with defendant, she testified that her second conversation with defendant lasted only 15 to 20 minutes. Miller spoke with defendant three times as a witness from the time of her arrival until about 4:30 a.m. At about 4:30 a.m., she was preparing to take a handwritten witness statement from defendant when she and the detectives noticed some inconsistencies between defendant's statement and the statement of Takesha and began to question defendant about those inconsistencies. Defendant asked what was going on with Takesha and was told that she had been arrested for murder. Defendant then stated that Takesha "wasn't the one" and that he wanted to tell the truth. At that point Miller and the detectives terminated the interview.

Youth officer McCluskey then arrived. When asked whether McCluskey had an opportunity to speak with defendant outside her pres-

ence, Miller responded "I don't recall. I left him in the room with him. I don't recall." Shortly after 5 a.m., Miller, the detectives and youth officer McCluskey went back in to talk to defendant. Miller advised defendant of his *Miranda* rights and told him that, even though he was a juvenile, he could be tried and sentenced as an adult for this crime. Defendant indicated to her that he understood his rights. After giving an oral statement, defendant chose to give a handwritten statement. Miller wrote out the statement in the presence of defendant. Defendant indicated to Miller that he had been treated "fine" by the police. Miller testified that she had offered defendant food and drink throughout the night and that he had not wanted anything. Miller had defendant read the first typed paragraph out loud to confirm that he understood how to read and write English. She then read the remainder of the statement to him out loud. Miller made any changes requested by defendant and defendant then signed each page of the statement. According to Miller, defendant was able to respond appropriately to her questions, never indicated he did not understand what she was saying or talking about, and gave intelligent answers to her questions that she was able to understand.

Dr. Michael Rabin testified on behalf of defendant at the hearing on the motion to suppress statements as an expert in the field of forensic psychology. Dr. Rabin had interviewed defendant in October 1996 to determine his IQ, reading ability, and ability to understand and waive his *Miranda* rights. Defendant had a verbal IQ score of 66, a performance score of 77, and a full scale IQ score of 69. The score of 69 placed defendant in the bottom 2% of the population in terms of intelligence. Dr. Rabin did not believe that defendant would have been able to understand written *Miranda* warnings because he was in the bottom 1% of the population in terms of reading comprehension. Defendant scored in the average range for verbal comprehension. Dr. Rabin believed that defendant appeared to be average in intelligence but had a borderline intelligence score due to his poor vocabulary and poor educational background. Defendant scored poorly on tests influenced by education, information, and vocabulary, and scored best on tests that focused on practical knowledge, social judgment, and reasoning. On cross-examination, Dr. Rabin testified that he had reviewed a report prepared by a social worker employed in his office that detailed an interview with defendant's mother. The report stated that defendant's mother believed defendant was able to waive his *Miranda* rights. Dr. Rabin also testified on cross-examination that he ultimately concluded defendant was competent to waive his *Miranda* rights and was fit to stand trial.

Laura Ball testified that she was defendant's mother. According to

Ball, she received a telephone call at approximately 4:45 a.m. on July 17, in which a police officer told her that defendant had confessed to murdering the victim. The officer who called her did not ask her to come down to the police station. Ball subsequently called the police station back and was told that defendant was going to be transferred out of the station and would not be there if she came down. Ms. Ball did not recall telling a social worker in Dr. Rabin's office that she believed defendant was able to understand and waive his *Miranda* warnings.

Defendant testified that he had accompanied Takesha and two other women to the police station on July 16. They arrived at 7:30 or 8 p.m. After meeting Detective Pittatsis, they were seated in a conference room for about 30 minutes. Defendant asked to use the bathroom and was escorted to the bathroom. He was then escorted to a room that contained nothing but two chairs. He sat by himself for awhile and then tried the door and found it locked. After 30 to 45 minutes, he was brought back to the conference room where he spoke with two detectives. After speaking with detectives, he was brought back to the room with the two chairs and waited for about 30 or 45 more minutes. The pattern then repeated itself. He was brought back to the conference room and then back to the small room more times than he could count.

Defendant told the police that he had not touched the victim and that he had seen Takesha striking the victim.

Eventually, the officers questioning him began to "curse" at him and told him he was going to take a lie detector test. Defendant testified that the officers told him to "tell the f—-ing truth" or they would beat him and to "tell the truth before they beat [him] like [he] beat that baby." At one point, defendant was lying on the floor by himself in a room because he was tired and detectives came in and began kicking him in the ribs. When he stood up, they began to hit him in the chest so he fell back down. Defendant acknowledged that he was never handcuffed while at the police station.

Defendant testified that when ASA Miller first questioned him, she did not identify herself as an assistant State's Attorney and he assumed she was with the police. According to defendant, ASA Miller was "cursing" at him along with the police detectives.

According to defendant, the detectives returned 30 minutes after they had been kicking and hitting him and told him they had something for him to sign and if he signed it he could go home. He was seated in a room with ASA Miller, who told him the same thing and showed him a statement that had already been written out. She also told him his mother was on her way. Defendant testified that he

had also asked to call his mother about two hours after arriving at the station and was told by a detective that she had been called and was on her way. According to defendant, he asked ASA Miller to read the statement she was asking him to sign but she refused and told him to sign it. ASA Miller did not identify herself as an assistant State's Attorney until defendant had signed the statement and was told he was charged with murder.

Prior to being interviewed by the detectives, defendant did not speak with a youth officer or receive *Miranda* warnings. According to defendant, he was never given his *Miranda* rights or told he could be tried as an adult. Defendant acknowledged that he had been arrested "plenty of times" in the past. He estimated that his actual number of arrests could be 20 or 30. He had been informed of his *Miranda* rights on some of those previous occasions.

Dr. Roni Seltzberg, a psychiatrist for the forensic clinical services in Cook County, testified that she had interviewed defendant on November 7, 1996. During their conversation, defendant told her that he had not asked for a lawyer during questioning at the police station because he did not feel he had been arrested and that if he had thought he was in trouble he would have asked for his mother. Defendant, on appeal, also discusses a November 12, 1996, letter in the record from Dr. Seltzberg to the judge who heard the pretrial motions. In the letter, Dr. Seltzberg concluded that defendant was fit to stand trial and would have been able to knowingly, intelligently, and voluntarily waive his rights at the time of his statement to police if *Miranda* warnings had been given to him verbally. The letter also notes that at the time of Dr. Seltzberg's November 7, 1996, examination of defendant, he was able to read the *Miranda* warning paragraph "only with encouragement to figure out a couple of the longer words." Dr. Seltzberg notes in the letter that defendant's ability to read the warnings with such limited assistance was due to reading tutorials received while incarcerated.

At trial, Takesha testified regarding the circumstances leading to the victim's death. She testified that, on the afternoon of July 15, she and defendant were in defendant's mother's apartment. The victim was crying. In an effort to get the victim to stop crying, she spanked the victim with an open hand a number of times. The victim continued to cry and Takesha grasped her by the arms and asked her what was wrong. Defendant then offered to put the victim to sleep while Takesha watched television in another room. Takesha heard the victim scream loudly five times while defendant was in the other room alone with her. The screams were unlike any Takesha had heard the victim make before. Takesha did not, however, get up to investigate because

when she yelled to defendant to ask what was wrong, defendant assured her everything was fine. Defendant subsequently brought the victim to her and told her the victim had fallen off the bed. The victim's eyes were wandering and she was having difficulty breathing. An ambulance was called. Defendant attempted to perform cardiopulmonary resuscitation (CPR) on the victim while they waited for the ambulance to arrive.

Takesha, in addition to testifying regarding the events leading to the victim's death, testified that she had gone to the police station on the day following the victim's death. According to Takesha, defendant had not really wanted to go to the police station with her but had ultimately ended up accompanying her to the station. Takesha acknowledged she had told the police that she had "spanked" the victim in order to get her to stop crying but denied telling the police that she had shaken the baby and yelled "shut up" when she continued to cry. Takesha acknowledged that, after being questioned, she was arrested at approximately 11:30 p.m. on July 16.

Defendant's testimony at trial regarding the events leading to the victim's death differed from Takesha's in some respects. He testified that Takesha was yelling at the victim to "shut up" and that he saw Takesha shaking and striking the victim. Defendant subsequently put the victim in a bed and then noticed she was not breathing. He brought the victim to Takesha and demanded that she call an ambulance. He then tried to revive the victim using CPR. Defendant denied ever striking the victim.

The written statement signed by defendant was made part of the record at trial. In it, defendant first acknowledged that he was aware of and understood his *Miranda* rights and that he could be tried and sentenced as an adult but wished to give a statement. The statement further stated that on July 15, the victim would not stop crying. Takesha was in defendant's room after failing in her attempts to sooth the victim. The victim was in another room when the defendant picked her up and took her to his brother's bedroom. According to defendant's statement, the victim's loud crying was making him angry because he was unable to get any sleep. When defendant attempted to quiet the victim, she began to cry louder. He then hit her on the left side of her face with his hand half open. She did not stop crying. He then struck her in the stomach with a closed fist. The victim continued to cry. Defendant struck her on the other side of her stomach with a closed fist and, when she continued to cry, struck her with his fist in the stomach area twice more. Defendant was now "real angry." The victim continued to cry. Defendant then struck her in the back of her head and she fell off of the bed onto the tile floor. When her head hit the

floor, it made "a nice loud sound." The victim stopped crying and defendant put her into the bed. Defendant looked back as he was leaving the room and saw that the victim's stomach was not moving. He picked the victim up and brought her to the room where Takesha was lying down. He told Takesha that the victim had fallen off the bed and that something was wrong with her. He then attempted to perform CPR but the victim began to cough up liquid and water was coming out of her nose. The victim then turned green. When paramedics arrived, they attempted to get a pulse on the victim but could not.

The statement signed by defendant also stated that the police and ASA Miller had treated him "good" and that he had been offered water and soda but had not wanted any. Defendant acknowledged in the statement that he was giving the statement freely and voluntarily and that he had come to the station of his own free will and turned himself in because he wanted to "get it off his chest" and "didn't want to run from the problem." Finally, the statement noted that ASA Miller had read the entire statement out loud to him and he had been allowed to make any changes or corrections he wanted.

Following the trial, defendant was found guilty of first degree murder and was sentenced to 35 years in prison.

On appeal, defendant first contends that his limited intelligence, age, lack of food and drink, extended isolation from his girlfriend, the length and intensity of his interrogation, and the failures of the police to provide him with *Miranda* warnings and access to an adult interested in his welfare combined to make it improbable that he voluntarily, knowingly, and intelligently confessed. The circuit court, defendant contends, therefore erred in denying his motion to suppress his confession.

■ On review, great deference will be given to the lower court's factual findings, and those findings will be reversed only if they are against the manifest weight of the evidence. *In re G.O.*, 191 Ill. 2d 37, 50, 727 N.E.2d 1003 (2000). The ultimate question of the voluntariness of defendant's confession will, however, be reviewed *de novo*. *In re G.O.*, 191 Ill. 2d at 50.

■ The test of voluntariness is whether, under the totality of the circumstances, a statement was freely made, without compulsion or inducement, with consideration given to both the characteristics of the accused and the details of the interrogation. *People v. Fuller*, 292 Ill. App. 3d 651, 664, 686 N.E.2d 6 (1997); *In re Lashun H.*, 284 Ill. App. 3d 545, 550, 672 N.E.2d 331 (1996). Voluntariness turns on several factors, including the age, education and intelligence of the accused; the length of the detention and the duration of the questioning; previous experience with the criminal justice system; falsely aroused

sympathy; offers of leniency or other promises to induce a confession; whether the accused was advised of his constitutional rights; and whether the accused was subjected to any physical mistreatment. *People v. House*, 141 Ill. 2d 323, 376, 566 N.E.2d 259 (1990); *In re L.L.*, 295 Ill. App. 3d 594, 600, 693 N.E.2d 908 (1998). Where juveniles are involved, additional factors must be considered, including the time the questioning occurred and whether a parent or other adult concerned with the juvenile's welfare was present either before or during interrogation. *In re L.L.*, 295 Ill. App. 3d at 600. When reviewing the ruling on a motion to suppress, a court of review is to consider both the evidence submitted at the suppression hearing and evidence submitted at trial. See *People v. Caballero*, 102 Ill. 2d 23, 34-36, 464 N.E.2d 223 (1984).

We note briefly that defendant, in arguing that the circuit court erred in denying his motion to suppress, explicitly states that, with the exception of one subissue, he is conceding the truth of the State's evidence and credibility of its witnesses.

Defendant argues that his age, intelligence, and experience contributed to the coercive circumstances that made his statement involuntary. We first note that defendant, although only 15 years old at the time of his arrest, had extensive experience with the police. Defendant himself testified that he had been arrested "plenty of times" and that he had been read his *Miranda* rights on prior occasions. Defendant acknowledges these prior experiences, but cautions that we should be skeptical of the ability of persons with low IQs to learn from experience.

Dr. Rabin, called as a witness by defendant, testified regarding defendant's verbal, performance, and full-scale IQs. Dr. Rabin concluded that defendant would have been unable to understand written *Miranda* warnings due to his poor reading comprehension, which ranked in the bottom 1% of the population. Dr. Rabin, however, also testified that defendant scored in the average range for verbal comprehension. Dr. Rabin believed that defendant was average in intelligence but had a poor educational background and vocabulary. On cross-examination, Dr. Rabin acknowledged that he ultimately concluded defendant had been competent to waive his *Miranda* rights. Dr. Rabin also testified on cross-examination that he had reviewed a report prepared by a social worker in his office following an interview with defendant's mother. According to the report, defendant's mother had stated that she believed defendant was able to waive his *Miranda* rights.

Defendant, as support for his arguments on appeal, discusses a letter in the record from Dr. Seltzberg to the court. In the letter, Dr.

Seltzberg stated that when she examined defendant more than a year after his arrest, he was able to read the *Miranda* warnings with some assistance and that his ability to read the warnings at that time was due in part to reading tutorials he received since being incarcerated. Dr. Seltzberg also concluded in the letter, however, that defendant would have been able to knowingly, intelligently and voluntarily waive his rights at the time of his arrest if the warnings were given verbally.

The circuit court judge who denied defendant's motion to suppress stated:

> "One of the things I noted about the defendant's testimony was he was not in any way inarticulate in any particular way. He sounded like a young man who perhaps has not had a lot of education, but he didn't seem to have any difficulty understanding the questions that were put to him nor did he seem to have any difficulty in responding appropriately to the questions that were put to him. He testified just fine.
>
> But for the allegation in the motion that says he has an IQ of 69, I don't know that it would have ever occurred to me at least for purposes of these proceedings of some marginal mental capacity. I didn't get the feeling that the defendant didn't know what was going on in this courtroom, and I suspect that he understood pretty well what was going on in the courtroom."

Defendant argues that this court should not defer to the above observations of the judge who denied the motion to suppress because a different judge heard the trial and, at sentencing, stated: "I don't doubt [defendant] has a low I.Q., and he is not intelligent as that term is defined. And that by any objective intelligence test he is probably well below average." We first note that the observations of the sentencing judge were general in nature and were not made for the purpose of determining defendant's ability to understand his *Miranda* warnings, while the comments of the first judge were in the specific context of ruling on defendant's motion to suppress. In addition, defendant ignores the fact that the same judge who made the quoted observation at sentencing also found the testimony and evidence presented at trial had made it "quite clear" that defendant had given a voluntary statement.

Defendant also maintains that any observations made by the judges should be discounted because those observations "apparently" failed to take into account the fact that defendant's "intellectual abilities" had increased as a result of education he received while incarcerated. Defendant points out that he received his psychological testing about 15 months after his arrest and had presumably received even more schooling prior to trial.

Defendant's argument that his education while incarcerated had improved his overall "intellectual ability" amounts to speculation and runs contrary to defendant's argument that his previous experiences with the police should be ignored due to his inability to learn from experience. Moreover, the court, when ruling on the motion to suppress, was aware from Dr. Seltzberg's letter that Dr. Seltzberg believed reading tutorials defendant received while incarcerated had improved his ability to read the *Miranda* warnings. Both Dr. Seltzberg and Dr. Rabin had concluded, however, that defendant would have been able to understand and waive *verbal Miranda* warnings at the time of his arrest. There is absolutely no evidence that the circuit court ignored the fact that defendant's reading had improved since his incarceration when it denied the motion to suppress. Instead, the record indicates that the court relied upon its own observations, and, presumably the testimony, evidence, and conclusions of Dr. Rabin and Dr. Seltzberg, including defendant's improved reading ability since being incarcerated, in determining that defendant was capable of making a knowing waiver of his *Miranda* rights and had given a voluntary statement.

■ Finally, we note that the circuit court, in denying defendant's motion to suppress statements, correctly noted that it had "the advantage of watching and listening to the defendant testify" in making its determination that defendant understood what was going on in court and had the intellectual ability to waive his *Miranda* rights. We cannot say that the court's findings regarding defendant's intellectual ability to understand and waive his rights were against the manifest weight of the evidence.

■ Defendant argues that his interrogation occurred at "the most coercive time possible: late night and early morning." We first note in this regard that all parties agree that defendant came to the police station voluntarily on the evening of July 16. There was nothing to prevent him from coming the following morning instead or even not coming at all. The defendant therefore chose the time of his interaction with the police. Further, we note that defendant has explicitly conceded, for purposes of this issue, the truth of the State's evidence and credibility of its witnesses. Detective Pittatsis testified that defendant was free to leave at any time prior to his arrest at approximately 4:30 a.m. Defendant could thus have left as it got late or he became hungry or tired. He failed to do so. In light of the above, it cannot be said that the lateness of defendant's interview was inherently coercive.

■ Defendant maintains that the absence of an adult interested in his welfare contributed to the coercive circumstances. Although a juvenile has no *per se* right to consult with an adult (*In re L.L.*, 295 Ill. App. 3d at 601), the presence or absence of a parent or youth officer is

relevant in determining the voluntariness of a defendant's confession (*Fuller*, 292 Ill. App. 3d at 665).

The State's evidence established that defendant informed his mother he was going to the police station. The evidence also shows that defendant's mother was called on two occasions but refused to come to the police station. After defendant's mother's initial refusal to come to the station, the police contacted a youth officer, who in turn called defendant's mother again. Even though it is not essential to voluntariness that a defendant confer with a youth officer or other adult prior to giving a statement (see *People v. McNeal*, 298 Ill. App. 3d 379, 391, 698 N.E.2d 652 (1998) (noting that it is not required that a minor see a youth officer prior to questioning)), there is some evidence in the record that defendant did confer with youth officer McCluskey prior to giving his statement. ASA Miller's testimony suggested that she may have left defendant alone with youth officer McCluskey. Further, although it is unclear whether the youth officer conferred alone with defendant before defendant gave his statement, there is no question that the youth officer was present when defendant gave his oral statement and when the statement was reduced to writing. The presence of a youth officer, although a significant factor, will not *per se* make a juvenile's confession voluntary. *Fuller*, 292 Ill. App. 3d at 665. However, the call by the youth officer to defendant's mother, and the presence of some evidence that the youth officer conferred with defendant privately prior to the time defendant gave his statement, distinguishes this case from cases where there was no evidence that the youth officer took any action or acted in a manner antagonistic to the defendant's rights. See *e.g.*, *In re L.L.*, 295 Ill. App. 3d at 603 (noting that the record indicated the youth officer failed to demonstrate any interest in the minor's welfare and was instead adversarial and antagonistic toward the respondent).

■ Defendant next contends that the length and intensity of his interrogation contributed to the coercive circumstances making his confession involuntary. According to the State's witnesses, the credibility of whom defendant does not dispute, defendant was treated as a witness until approximately 4:30 a.m. on July 17. Although he had been at the police station for approximately eight hours by that point, he was questioned only intermittently. See *People v. Melock*, 149 Ill. 2d 423, 452-53, 599 N.E.2d 941 (1992) (noting that while the period of defendant's detention was lengthy, the fact that the questioning was not incessant over the course of that period was favorable on the issue of voluntariness). The testimony of Detective Pittatsis appears to indicate that defendant was only interviewed for a total of about 90 minutes in the four hours he was present at the station prior to

midnight. According to ASA Miller, one of the interviews after midnight was only 15 to 20 minutes long. Moreover, although defendant contends on appeal that his interrogation "was clearly intense," the record does not indicate that this was necessarily so.

■ Defendant next argues that his lack of food during the eight hours he spent at the police station contributed to the coercive circumstances making his statement involuntary. Detective Pittatsis testified that while defendant was being treated as a witness, he was offered neither food nor drink per police policy. ASA Miller testified that defendant refused offers of food and drink. The statement signed by defendant indicates that he was offered soda and water but refused. Although there is no evidence that defendant either ate or drank anything while at the police station, there was evidence, albeit conflicting, that offers of food and drink were made.

■ Defendant next argues that his extended isolation from his girlfriend contributed to the coercive circumstances. The police asked Takesha to come to the police station and testified that she was the focus of their investigation. It was therefore reasonable for the police to separate defendant from Takesha and compare her version of the facts to his.

■ Defendant maintains that the failure of the authorities to provide any *Miranda* warnings prior to his making incriminating statements contributed to the coercive circumstances making his statement involuntary. It is, however, undisputed that defendant was at the station voluntarily as a witness until 4:30 a.m. when he made incriminating statements and was taken into custody. *Miranda* warnings were given at that time and were not required to have been given before that point.

■ Finally, defendant contends that the police acted deceptively by misleading him into believing he was a witness when he was actually a suspect. To the extent the circuit court found the testimony of the State's witnesses credible on this issue, defendant maintains, that ruling was manifestly erroneous. Defendant first maintains that police testimony that Takesha was their only suspect makes no sense in light of the other evidence and calls into doubt Detective Pittatsis' testimony that, prior to defendant's confession, he did not find defendant's story to be unbelievable. Defendant also contends that Detective Pittatsis informed defendant that Takesha had been arrested in an effort to falsely arouse his sympathy for Takesha.

We find the arguments of defendant to be without merit. The police requested that Takesha, not defendant, come to the police station. The police had good reason to consider Takesha a suspect because she admitted to the police that she had "spanked" the victim because the

victim would not stop crying. Defendant testified that he told the police he had seen Takesha striking the victim. Simply because the victim's injuries did not match up exactly with Takesha's statements did not, as implied by defendant on appeal, make defendant an automatic suspect. Nor is the repeated questioning about the events surrounding the victim's death or the request to take a lie detector test to verify the information defendant was giving them about Takesha necessarily indicative that the police considered defendant anything more than a witness. Finally, where Takesha was arrested at 11:30 p.m. on July 16 and defendant was finally told of her arrest when he inquired about her status at approximately 4:30 a.m., we find that her arrest was clearly not made for the purpose of arousing defendant's sympathy. Takesha was asked at trial whether she was arrested as a potential offender pursuant to the police investigation. We fail to see how Takesha's answer of "[t]hat's correct" establishes, as argued by defendant, that her arrest was "a sham arrest creating a tool to cause [defendant] to break down." The circuit court's credibility findings in favor of the State were not against the manifest weight of the evidence.

■ We do not find any of the circuit court's factual findings to be against the manifest weight of the evidence and, considering the totality of the circumstances under *de novo* review, find the circuit court did not err in denying defendant's motion to suppress his confession.

■ Defendant maintains that the circuit court erred in denying his motion to quash arrest. Both the United States and Illinois Constitutions protect the right of an individual to be free of unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. A seizure occurs when by means of physical force or a show of authority a person's freedom of movement is restrained. *Melock*, 149 Ill. 2d at 436-37. "A person is seized within the meaning of the fourth amendment only when, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *People v. Taggart*, 233 Ill. App. 3d 530, 547, 599 N.E.2d 501 (1992). Factors to be considered in determining whether a seizure occurred include (1) the time, place, length, mood, and mode of interrogation; (2) the number of police officers present; (3) any indicia of formal arrest or restraint; (4) the intent, knowledge, and investigative focus of the officers; (5) the subjective belief of the defendant; (6) statements and nonverbal conduct of the police, including statements regarding whether or not a defendant was free to leave; (7) how defendant arrived at the police station; and (8) whether the defendant was placed in an interview room as opposed to a common area. See *People v. Williams*, 303 Ill. App. 3d 33, 40, 707 N.E.2d 679

538

(1999); *People v. Sneed*, 274 Ill. App. 3d 274, 279, 653 N.E.2d 1340 (1995).

•■ According to the State, defendant was treated as a witness until 4:30 a.m., and prior to that time, there was no evidence that defendant had committed a crime and thus no probable cause. According to defendant, however, what began as a voluntary encounter eventually, due to a number of factors, ripened into a seizure prior to his formal arrest. Specifically, defendant contends that the time and place of interrogation were coercive, the mood and mode of interrogation were coercive, the police control of his movements was coercive, the statements and conduct of the police communicated to him that he was not free to leave, and his low IQ made an already coercive situation worse.

Both parties agree that defendant came to the police station voluntarily at approximately 8 p.m. Thus, as noted previously, defendant, not the police, determined what time the interview took place. Because Takesha was a suspect, the police reasonably separated her and defendant so that they could match her account of events with his in an effort to find inconsistencies in her story. Defendant was asked if he was willing to take a lie detector test to verify the information he was conveying regarding Takesha's actions but never took such a test. Defendant was never handcuffed. Nor, according to the State's witnesses, the credibility of whom defendant does not dispute, was defendant ever locked up. There was no testimony that the police displayed weapons or otherwise made a nonverbal show of authority. Their actions in escorting defendant to the bathroom when he asked to use it were neither unreasonable nor coercive. Defendant's failure to eat or drink anything during his time at the police station is not illustrative of a coercive mood or mode of interrogation where there was some evidence indicating defendant was offered both food and drink but refused. Defendant complains that he was never informed he was free to leave the police station. There was no evidence, however, indicating defendant was prevented from leaving the station at any time. In fact, Detective Pittatsis testified that defendant was free to leave at any time prior to making his incriminating statement at 4:30 a.m. This was not defendant's first encounter with the police. In fact, according to defendant, he had been arrested "plenty of times" in the past. In light of that fact, we find it significant that defendant told Dr. Seltzberg that he had not requested an attorney while at the police station on July 16 and 17 because he did not feel he had been arrested and that if he had believed he was in trouble he would have asked for his mother. Finally, defendant's low intelligence, as measured through testing, is not necessarily indicative of his ability to comprehend the

events that transpired at the police station. The evidence does not support defendant's contention that he was effectively seized prior to his formal arrest at 4:30 a.m. on July 17, and his motion to quash arrest was therefore properly denied.

•■ Defendant contends that the circuit court erroneously considered irrelevant subjective police intentions in determining whether probable cause existed at the time of arrest and barred evidence of objective issues relevant to when an arrest occurred. Defendant's argument is based on a portion of the following exchange that occurred at the outset of the hearing on the motion to quash arrest and suppress evidence:

"[DEFENSE COUNSEL]: Your Honor, the State has indicated they are prepared to proceed on the Amended Motion to Quash Arrest and Suppress Evidence. It has been amended to include—somewhat unusual, maybe—well, under People versus Sneed, I believe I provided the Court with a copy of that case. What that case basically indicates is that various factors go into the question of whether the Defendant had [a] reasonable belief that he was not free to leave.

THE COURT: Counsel, this is a Motion to Quash Arrest. The issue is, A, whether there had been a crime committed; and B, whether the officers—depends on what's going on with the officers, not what's going on in [defendant's] own head. A Motion to Quash Arrest is based on the assertion that the officers had no probable cause to arrest the Defendant. That's the issue in a Motion to Quash. I don't understand at all this other stuff.

[DEFENSE COUNSEL]: Well, I think whether the Defendant—I think it's going to show that there are two different ideas about when this arrest occurred. The arrest, according to the Defense, occurred shortly after the Defendant arrived at the station.

\* \* \*

THE COURT: The question still is whether or not, whenever he was arrested, there was probable cause. That's the issue on the Motion to Quash."

Defendant asserts that the court's reference to "what's going on with the officers" indicated that it later erroneously relied upon the subjective intentions of the officers in denying the motion to quash arrest. Defendant maintains that the court's alleged error was compounded by the court's refusal to allow defense counsel to question the arresting officer about how many times he questioned defendant and for how many hours.

As noted above, the circuit court stated that what was "going on with the officers" was the relevant inquiry, rather than the subjective beliefs of defendant. Defendant maintains that the circuit court's ref-

erence to what was "going on with the officers" was to what their subjective beliefs and intentions were. Initially, we note that the intent of an officer is a relevant factor to consider in determining whether a seizure has occurred. See *Melock*, 149 Ill. 2d at 437. Moreover, we believe the more reasonable interpretation of the court's statement is that it was referring to the actual actions of the police officers. We are thus not persuaded that the circuit court's statement indicates the case was decided based on an incorrect understanding of the law. In support of our finding, we note that the factors cited by the court in denying the motion, including defendant's voluntary appearance at the police station, the fact that he was never handcuffed and was never placed in an interrogation room during the relevant time period, and the fact that defendant never asked to leave, do not indicate that the court was basing its ruling on the subjective beliefs of the police officers.

● Defendant complains that he was barred from asking questions regarding the number of times he was interviewed and the length of the various interviews. Although certain objections were sustained, there are references throughout the record to the fact that Detective Pittatsis interviewed defendant approximately six times between the hours of 8:30 a.m. on July 16 and defendant's arrest at 4:30 a.m. on July 17. The record also indicates that Detective Pittatsis' first interview with defendant lasted approximately one hour, and the second lasted approximately 30 minutes. In addition, ASA Miller testified that one of the interviews of defendant after midnight lasted approximately 15 to 20 minutes.

Defendant also complains that he was barred from asking defendant whether he was told he was free to leave. Although the court sustained an objection when defendant was asked if the assistant State's Attorney had ever told him that it was okay to leave, defendant had already testified that the assistant State's Attorney had failed to tell him at any time that he did not have to stay and answer questions. The questions asked essentially the same thing, and the circuit court properly sustained an objection to the second repetitive question. In addition, Detective Pittatsis had already testified that because defendant had come to the station voluntarily, he had not told defendant he was free to leave.

The record does not, therefore, support defendant's contentions that the circuit court erroneously considered irrelevant evidence and incorrectly excluded relevant objective evidence in ruling on the motion to quash.

■ Finally, defendant maintains, and the State concedes, that the mittimus in this case must be amended to reflect a total of 1,061 days

of credit for pretrial custody against defendant's sentence where the credit was erroneously computed as 1,059. We therefore order that the mittimus in this case be corrected to reflect a total of 1,061 days of pretrial custody.

The various rulings of the circuit court are affirmed. Pursuant to Rule 615(b)(1) (134 Ill. 2d R. 615(b)(1)), we correct the mittimus in this case so that it reflects a total of 1,061 days of pretrial custody.

Affirmed and mittimus corrected.

McNULTY, P.J., and GORDON, J., concur.